**UNITED STATES of America**
v.
**David Henry MITCHELL, III.**
**Cr. No. 11486.**

United States District Court
D. Connecticut.

Dec. 6, 1965.

---

Jon O. Newman, U. S. Atty., Howard T. Owens, Jr., Asst. U. S. Atty., and Samuel J. Heyman, Asst. U. S. Atty., New Haven, Conn., for United States.

Conrad J. Lynn, of Lynn, Spitz & Condon, New York City, Anthony G. Apicella (Court-appointed), of Garber & Apicella, New Haven, Conn., and William K. Muir, Jr., of Gumbart, Corbin, Tyler & Cooper, New Haven, Conn. (New Haven Civil Liberties Council, amicus curiæ), for defendant.

TIMBERS, Chief Judge.

Defendant David Henry Mitchell, III, after a three day trial was convicted by a jury of wilful failure to report for induction in the armed forces of the United States, in violation of Section 12(a) of the Universal Military Training and Service Act, 50 U.S.C. App. § 462(a). He was sentenced, under 18 U.S.C. § 4208(a)(1), to not less than 18 months and not more than 5 years in prison and was fined $5,000.[1] His post-conviction motion for a judgment of acquittal or a new trial, supported on one issue by the New Haven Civil Liberties Council, was denied. He has appealed, pursuant to a notice of appeal filed by his court-appointed counsel, and has been enlarged on bail pending appeal.

## JURISDICTION AND VENUE

Jurisdiction is founded on Section 12 (a) of the Universal Military Training and Service Act, 50 U.S.C. App. § 462(a).

Venue is laid properly in this District; the location of the Local Board having jurisdiction over the place of residence of defendant at the time he originally registered has continuing jurisdiction over him;[2] and the Local Board with which he was registered and to which he failed to report for induction is the situs of the offense here charged,[3] despite the fact he was living outside of the District at the time he failed to report for induction.[4]

## QUESTION PRESENTED

The critical question here presented is whether, in view of the command of Congress in the section of the statute under which this prosecution was brought that trial of such cases shall be given precedence and shall be advanced for immediate hearing,[5] a defendant on the very day his case has been assigned for trial may discharge counsel who has served him to his satisfaction for more than a year and, claiming inability to retain substitute counsel during a five day continuance because of his insistence that the case be defended on the ground of issues rejected by the Court in denying a motion to dismiss the indictment, may, after waiving right to counsel and electing to defend pro se and rejecting assistance of court appointed counsel, be

---

1. The Court recommended at time of sentencing that defendant's application for parole after 18 months of imprisonment be considered by the Board of Parole only on the condition that defendant shall unequivocally agree to report for induction in the armed forces of the United States. Cf. Selective Service Regulations, § 1642.33, 32 C.F.R. 1642.33.

2. Selective Service Regulations, § 1613.12 (a), 32 C.F.R. 1613.12(a).

3. United States v. Anderson, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946).

4. Jones v. Pescor, 169 F.2d 853, 855 (8 Cir. 1948); cf. Johnston v. United States, 351 U.S. 215, 220–221, 76 S.Ct. 739, 100 L.Ed. 1097 (1956).

5. 50 U.S.C.App. § 462(a):
"* * * Precedence shall be given by courts to the trial of cases arising under this title, and such cases shall, upon request of the Attorney General, be advanced on the docket for immediate hearing."

granted a new trial more than four years after refusing to fill out his classification questionnaire, returning his classification card, "disaffiliating" himself from Selective Service and being declared a delinquent by his Local Board? The Court holds that a new trial will not be granted under such circumstances.

Defendant's post-conviction motion for a judgment of acquittal or a new trial raises issues regarding his claims as to the sufficiency of the evidence, the sufficiency of the indictment and his right to counsel. The Court makes the following findings of fact and conclusions of law upon the issues raised by defendant's claims—grouped for convenience of reference under the headings: I. Trial Issues And Evidence Adduced, and II. Issues On Motion To Dismiss Indictment And Their Relation To Defendant's Right To Counsel.

6. Court's Charge to the Jury, Tr. 242–243, 9/15/65 [R. 293–294]. See United

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.

### TRIAL ISSUES AND EVIDENCE ADDUCED

(A) *Issues At Trial*

[3] The issues upon which defendant was tried were simple and narrow:[6]

(1) Whether a valid induction order had been issued by defendant's local board requiring him to report for induction.

(2) Whether notice of such induction order had been given to defendant.

(3) Whether defendant failed to report for induction pursuant to such order.

(4) Whether defendant's failure to report was a wilful and knowing failure.

(B) *Evidence At Trial*

The evidence, largely documentary, was concise:[7]

States v. Daily, 139 F.2d 7, 9 (7 Cir. 1943).

7. The documentary evidence consisted of the complete file concerning defendant kept by his Local Board (Govt. Ex. 2), including certain documents from that file which were separately marked (Govt. Exs. 2A through 2H). Two witnesses testified: Edith Moriarty, clerk of the Local Board, and Robert G. Ibbott, special agent of the FBI who arrested defendant June 1, 1965. The transcript records the following proceedings, upon the dates and according to the typewritten pagination indicated.

| Proceedings | Date | Transcript Pages | Record Pages |
|---|---|---|---|
| Proceedings in connection with plea and modification of bond | 6/14/65 | 1–9 | 350–358 |
| Proceedings on motion to dismiss indictment | 9/7/65 | 1–16 | 334–349 |
| Proceedings on application for continuance of trial | 9/8/65 | 1–10 | 359–368 |
| Proceedings on first day of trial (impaneling jury) | 9/13/65 | 1–81 | 52–132 |
| Proceedings on second day of trial (witnesses Moriarty and Ibbott) | 9/14/65 | 84–180 | 135–231 |
| Proceedings on third day of trial (witness Ibbott concluded; defendant's motions for judgment of acquittal; argument to jury; Court's charge to jury; verdict) | 9/15/65 | 183–279 | 234–330 |
| Proceedings on third day of trial continued (sentencing; directing that notice of appeal be filed; fixing bail pending appeal) | 9/15/65 | 1–24 | 369–392 |
| Proceedings on motion of New Haven Civil Liberties Council for judgment of acquittal or new trial | 9/27/65 | 1–56 | 393–448 |

Citations herein to the transcript will be to the typewritten page number, followed by the date of the proceedings. The page of the original record on appeal will be set forth in brackets, e. g. [R. 218].

(1) January 30, 1961, defendant, age 18, then residing at White Oak Shade Road, New Canaan, Connecticut, registered with Selective Service Local Board No. 17 in Norwalk, Connecticut, and was assigned Selective Service No. 6–17–43–18.[8]

(2) February 10, 1961, a registration certificate was sent to defendant by the Local Board.[9]

(3) August 3, 1961, a classification questionnaire was sent to defendant by the Local Board which he did not return.[10]

(4) October 10, 1961, the Local Board classified defendant IA as a delinquent who had failed to return his questionnaire.[11]

(5) October 11, 1961, a delinquency notice and a IA classification card were sent to defendant by the Local Board.[12]

(6) December 3, 1961, defendant wrote to the Local Board,[13] acknowledging receipt of the delinquency notice and classification card mailed to him October 11, 1961, stating that "I *refuse* and enclose" (Emphasis that of defendant) the classification card [14] and enclosing a "Statement of Selective Service Disaffiliation" dated December 3, 1961, signed by defendant.[15]

(7) August 11, 1964, the Local Board again classified defendant IA.[16]

(8) August 18, 1964, a IA classification card was sent to defendant at 1010 President Street, Brooklyn, N. Y. by the Local Board.[17] This classification card was not returned by defendant,[18] nor did he at any time request a hearing before the Local Board regarding his classification.[19]

8. Tr. 167, 9/14/65 [R. 218]; Govt. Ex. 2, Document No. 1.

9. Tr. 170, 9/14/65 [R. 221].

10. Tr. 168–169, 9/14/65 [R. 219–220].

11. Govt. Ex. 2, Document No. 2 and Document No. 1 (last page).

12. Govt. Ex. 2, Document No. 4 and Document No. 1 (last page); Selective Service Regulations, § 1623.1, 32 C.F.R. 1623.1.

13. Govt. Ex. 2G; Tr. 157, 159–165, 9/14/65 [R. 208, 210–216].

14. Govt. Ex. 2, Document No. 7–A.

15. Govt. Ex. 2H; Tr. 157, 159–165, 9/14/65 [R. 208, 210–216].

16. Tr. 117–118, 9/14/65 [R. 168–169]; Govt. Ex. 2, Document 1 (last page). The lapse of time between the Local Board's action on October 10, 1961 classifying defendant IA and its similar action on August 11, 1964 was due to Selective Service policy of not inducting men until after their 22nd birthday (which defendant would reach January 7, 1965). Govt. Ex. 2, Document 5. During this interval, as a result of appropriate inquiry by the Local Board to Connecticut State Headquarters of Selective Service and appropriate advice given by National Headquarters of Selective Service, it was decided that the Local Board's prior determinations of defendant's delinquency status were ineffective because of failure to record in defendant's file the action and vote of the Local Board declaring defendant a delinquent. For this ° reason, defendant's processing was begun anew, resulting in the Local Board's August 11, 1964 classification of defendant as IA. Govt. Ex. 2, Documents 4, 5, 20, 20–1. Defendant was so informed. Govt. Ex. 2, Document No. 26.
During this interval, also, the Local Board, acting upon the advice of State Headquarters, informed defendant on October 17, 1961. "If you believe you have a conscientious objection to war you may request Special Form for Conscientious Objector (SSS Form 150)". Govt. Ex. 2, Document No. 6. Defendant replied on December 3, 1961 by flatly refusing to claim conscientious objector status; he repeated what he had said in his October 8, 1961 letter to the Local Board (Govt. Ex. 2, Document 3), "I have not been carrying a draft card for some time and I do not wish to cooperate, even to the extent of attempting to obtain C.O. classification", adding, "I will not fill out forms for the Selective Service System." Govt. Ex. 2G.

17. Tr. 119–120, 9/14/65 [R. 170–171]; Govt. Ex. 2, Document No. 1 (last page) and Document No. 22.

18. Tr. 119, 9/14/65 [R. 170].

19. Tr. 118, 9/14/65 [R. 169]. Defendant by letter of May 29, 1964 informed the Local Board that his home address was 1010 President Street,

(9) September 25, 1964, an order to report for physical examination on October 21, 1964 was sent to defendant by the Local Board.[20]

(10) October 21, 1964, defendant failed to report for physical examination as ordered.[21]

(11) November 10, 1964, the Local Board declared defendant a delinquent because of his failure to report for physical examination and sent him a delinquency notice.[22]

(12) December 14, 1964, the Local Board ordered defendant to report for induction on January 11, 1965 [23] and sent the order to defendant at 150 Crown Street, Brooklyn, N. Y., under cover of a letter dated December 14, 1964; [24] being a delinquent, he was in the category first to be called among those available for induction.[25]

(13) January 6, 1965, the Local Board received defendant's letter of January 4, 1965 acknowledging receipt of the Board's letter of December 14, 1964 under cover of which the Board had sent defendant the order to report for induction.[26]

(14) January 11, 1965, defendant failed to report for induction as ordered.[27]

(15) January 19, 1965, the Local Board reported defendant as a delinquent to the United States Attorney for the District of Connecticut; the Board reported that defendant, in addition to failing to report for induction as ordered December 14, 1964, had failed to complete and return the classification questionnaire sent to him August 3, 1961 and had failed to report for physical examination as ordered September 25, 1964.[28]

(16) During the period between December 14, 1964, when he was ordered to report for induction, and the time of trial, September 14, 1965, defendant did nothing to comply or attempt to comply with the order to report for induction.[29]

Brooklyn, N. Y. (Govt. Ex. 2, Document 15), as did defendant's attorney, Conrad J. Lynn, Esq., by letter of May 30, 1964 (Govt. Ex. 2, Document 16). Mr. Lynn stated in this letter, "The End The Draft Committee Of Brooklyn, New York, has retained me to defend Mr. Mitchell in any court of original jurisdiction and in all appellate courts which may be necessary."

In response to Mr. Lynn's statement in his May 30, 1964 letter to the Local Board that "your local board does not have jurisdiction to order [Mitchell] to report for induction," the Local Board promptly replied by letter of June 3, 1964 that "under Selective Service regulations [Selective Service Regulations, § 1613.12(a), 32 C.F.R. 1613.-12(a)] the 'place of residence' (line 2 of the Selective Service System Registration Card) which the individual gives at the time of registration determines the local board *that will always have jurisdiction over the registrant.* The address Mr. Mitchell gave at the time he registered comes under the jurisdiction of this local board." (Emphasis that of Local Board) Govt. Ex. 2, Document No. 18.

20. Tr. 120–123, 9/14/65 [R. 171–174]; Govt. Ex. 2A; Govt. Ex. 2, Document No. 1 (last page).

21. Tr. 139, 9/14/65 [R. 190]; Govt. Ex. 2, Document No. 1 (last page).

22. Tr. 124–126, 139–141, 9/14/65 [R. 175–177, 190–192]; Govt. Ex. 2B; Govt. Ex. 2, Document No. 1 (last page); Selective Service Regulations, § 1642.4, 32 C.F.R. 1642.4.

23. Tr. 141–142, 144, 9/14/65 [R. 192–193, 195]; Govt. Ex. 2C; Govt. Ex. 2, Document No. 1 (last page).

24. Tr. 141–143, 145–148, 9/14/65 [R. 192–194, 196–199]; Govt. Exs. 2C and 2E; Govt. Ex. 2, Document No. 1 (last page). Defendant in an undated letter received by the Local Board on December 1, 1964 indicated his address was 150 Crown Street, Brooklyn, N. Y. Tr. 144–145, 9/14/65 [R. 195–196]; Govt. Ex. 2D.

25. Tr. 141, 9/14/65 [R. 192]; Selective Service Regulations, § 1621.7(a), 32 C.F.R. 1621.7(a).

26. Tr. 151–153, 9/14/65 [R. 202–204]; Govt. Ex. 2F.

27. Tr. 148–149, 9/14/65 [R. 199–200]; Govt. Ex. 2, Document No. 1 (last page).

28. Govt. Ex. 2, Document No. 33 and Document No. 1 (last page); Selective Service Regulations, § 1642.41, 32 C.F.R. 1642.41.

29. Tr. 156–157, 9/14/65 [R. 207–208]

(C) *Conclusions As To Trial Issues And Evidence Adduced*

(1) The evidence establishing each essential element of the crime charged was clear and convincing.

(2) The government sustained its burden of proving beyond a reasonable doubt that defendant wilfully and knowingly failed to report for induction in the armed forces of the United States pursuant to a valid induction order of his Local Board which he received.

(3) The jury's verdict of guilty is amply supported by the evidence.

## II.

ISSUES ON MOTION TO DISMISS INDICTMENT AND THEIR RELATION TO DEFENDANT'S RIGHT TO COUNSEL

(A) *Defendant's Declaration Of Purpose To Which He Intended To Subvert His Trial*

(1) Defendant's declaration that "I plan to use my trial as a forum in which to try the United States Government before the world * * * and utilize every other means available to stir up a storm" is set forth in a statement sent by defendant to his Local Board on June 9, 1964: [30]

*"CHALLENGE THE DRAFT!*
by Dave Mitchell

"After nearly three years of numerous forms, threats and FBI visits, I have been ordered to report for induction on June 10, 1964, because of my refusal to cooperate with the draft. The purpose of this article is not to rehash my position on draft refusal— for that has been covered in printed statements and will be expanded in future issues of *downdraft*. This article will discuss the failure of draft refusers to focus on the issues and some means by which I plan to raise the issues.

"The problem with the anti-draft movement isn't that the government has been too strong, but rather that the movement has been too weak and emasculated by individualistic abstraction. Instead of analyzing the militarism which the draft upholds, the movement tends to withdraw from those issues and talks instead about non-violence and love or retreats into other such philosophical ivory towers. We must get down to the job of fighting the draft and changing the world, not by getting stuck on the *you* involved in the draft, but by getting involved with fighting the draft as a threat to the world.

"In my own case, my draft refusal rests, not on an abstract philosophy, but on the political situation as it exists. I noncooperate with my government, not because I am a pacifist or occupy a position somehow uninvolved with the world, but on the contrary because I am very involved and specifically condemn the United States for crimes against peace and humanity. I refuse to cooperate with any Koreas, Cuban invasions or blockades, Vietnams, or with the nuclear arrogance with which we threaten to blow up the world.

"Arrest and trial should not be a time when we—with a limited number of friends—react by meditation and philosophical backslapping. Rather, attacks and threats by the 'powers-that-be' should be exploited as opportunities to focus on the issues. Let's remember why we're involved in the fight against the draft, not simply to communicate with our souls, but to speak to the world in order to change it. *The government helps increase the interest in the issues by prosecuting draft re-*

---

**30.** Govt. Ex. 2, Document No. 19, pp. 3–5; see also defendant's affidavit of July 29, 1965 in support of motion to dismiss indictment, pp. 2–3.

This statement appeared in the May 1964 issue of "Downdraft"—defendant's self-styled publication on behalf of his self-appointed "End The Draft Committee", both of which were headquartered at defendant's 1010 President Street residence address.

*fusers. Our job is to utilize every threat, FBI visit, court fight, or jailing as a means of following through on our prosecution of militarism and the real criminals. When the government acts and creates publicity on the issue, we must utilize every means to make sure that they end up with burnt fingers and a kick in the behind.* (Emphasis added)

"Many draft refusers fail to get down to political issues in their cases; many refuse to contest their own 'legal guilt' in court. Yet an effective way of challenging our government's policies and morality is by maintaining a *not guilty* plea in the courts. The position of individual guilt and individual responsibility, and therefore one's obligation to dissociate himself from war crimes, is established—not only philosophically by Thoreau, etc.—but historically and legally by Nuremberg International Law which is part of the law of every country. Under International Law the United States is guilty of Crimes Against Peace and is also in violation of the Kellogg-Brand Pact, other international agreements, and Article 2 Section 4 of the United Nations Charter [59 Stat. 1033] which prohibits a policy of force and threats of force. Only if we served as accomplices in these activities would we be guilty morally or legally.[1]

"1. Fyke Farmer, a noted lawyer, fought and lost [Fyke Farmer v. United States, 252 F.2d 490 (6 Cir. 1958), affirming 149 F.Supp. 327 (M.D.Tenn.1956)] when he tried to use international law as a basis for tax refusal during the Korean War. His brilliant defense brief is both an education and a solid foundation for efforts such as mine.

"*If I am brought to trial, I plan to use my trial as a forum in which to try the United States Government before the world. With my lawyer, Conrad Lynn, the noted civil rights lawyer, and with the End The Draft committee, I will fight my case through the courts as far up as necessary and utilize every other means available to stir up a storm.* Also I will petition the Secretary General and the General Assembly of the United Nations and individual nations in order to attain a hearing in the General Assembly, as representatives from South West Africa have done in the past. The General Assembly would be asked to consider my case as a question of International Law. (Emphasis added.)

\* \* \* \* \* \*

"We should never allow ourselves to be salted away either in court entanglements or in jail. We should wage the battle on as many fronts as possible in the realization that the draft and militarism cannot be disconnected from the general insanity of our country. Besides the work of lawyers and defense committees, we should be prepared to cause people to focus and refocus even when we end up in jail.

"I am preparing to follow through if I end up in jail by issuing a publication every week. Through prearranged means of communication, I would issue a weekly paper which would continue the fight against the draft and also take up the monstrosities of the prison system, the plight of political prisoners and other penal points. The paper already has a name—*HARD CELL: for Peace and Freedom*—and indicates the volume numbers with Block I, Bar 1. The uniqueness of such a publication (at least in this country), which would also issue a continuous appeal to the United Nations, could attract international sponsorship and stir public interest on a worldwide scale.

"There are other means to keep the issues alive, but the main point is that the protest must not end when there is a change in the proceedings. Only our means should change in order to use government actions and proceedings as opportunities to focus against the government. Our best battle tactics are to remain realistically on the peace issues, and to use every government maneuver as a means of launching an offensive."

(B) *Indictment; Appearance Of Counsel; Issues Raised On Motion To Dismiss*

(2) May 20, 1965, defendant was indicted by a grand jury at New Haven for wilfull failure to report for induction in the armed forces of the United States, in violation of 50 U.S.C. App. § 462; the Court ordered an appearance bond in amount of $1,000 without surety, a bench warrant for defendant's arrest and that an application be sent to defendant for court-appointed counsel if he were financially unable to obtain counsel.[31]

(3) June 14, 1965, defendant's counsel, Conrad J. Lynn, 401 Broadway, New York, N. Y., appeared with defendant for arraignment at the New Haven seat of Court; his counsel applied for and was granted permission "to appear for the defendant in this case for all purposes"; defendant pleaded not guilty and requested trial by jury; he was released in $1,000 bond, by the terms of which he was restricted to the Southern District of New York, the Eastern District of New York and the District of Connecticut (despite the request of defendant's counsel that the Court "remove all bail limits, that he be permitted to travel freely, without restriction" because "defendant * * * as part of his activity * * * has been invited to speak in various states." [32]

(4) August 2, 1965, defendant filed a motion to dismiss the indictment, although permission of the Court had been neither sought nor obtained to file such motion which "shall be made before the plea is entered" unless such permission is obtained.[33] The motion was filed by defendant's counsel, Lynn, was supported by defendant's affidavit of July 29, 1965, was accompanied by a 37 page printed brief and was noticed for hearing in New Haven on September 27, 1965 (which is not a motion day in New Haven).[34]

(5) August 4, 1965, the case was assigned for trial at New Haven on September 8, 1965 and notice of such trial assignment was sent to defendant's counsel on August 4. In response to attorney Lynn's letter of August 6 inquiring about the trial status of the case in view of the pending motion to dismiss the indictment, the Clerk of the Court on August 12 wrote a letter to attorney Lynn informing him that the motion to dismiss would be heard on September 7 and "The case is to hold its place on the jury assignment list for the present time pending disposition of the motion in question."[35]

(6) September 7, 1965 (Tuesday), pursuant to the August 12 notice to counsel, a hearing was held on the motion to dismiss the indictment. No limitations as to either time or subject matter were imposed; counsel on both sides were permitted to argue as long as they wished and to argue any issues they wished to raise.[36] Defendant was present throughout the argument; he conferred with his counsel, Lynn, from time to time before the argument, during the argument and just before Lynn concluded the argument; and there appeared to be complete compatibility between defendant and his counsel throughout.[37]

(7) The following issues were raised by defendant's motion to dismiss the in-

31. Docket Entries for 5/20/65 [R. 1].

32. Docket Entries for 6/14/65; Tr. 1-9, 6/14/65 [R. 350-358]; Tr. 42, 9/13/65 [R. 93].

33. Rule 12(b)(3), Fed.R.Crim.P.

34. Docket Entries for 8/2/65; [R. 2-6].

35. Tr. 43-44, 9/27/65 [R. 435-436]; original letter of August 6, 1965 from Conrad J. Lynn, Esq. to Gilbert C. Earl [R. 8]; copy of letter of August 12, 1965 from Gilbert C. Earl to Conrad J. Lynn, Esq. [R. 7].

36. Docket Entries for 9/7/65; Tr. 1-16, 9/7/65 [R. 334-349]; Tr. 22, 9/27/65 [R. 414].

37. Tr. 11, 9/13/65 [R. 62]; Tr. 22-23, 9/27/65 [R. 414-415].

dictment as set forth in his printed brief in support of the motion: [38]

POINT I—The draft call is constitutionally invalid.

POINT II—The individual must dissociate himself from the war crimes of his government.

POINT III—The United States is committing crimes against peace.

POINT IV—United States authorities and their agents are committing war crimes and crimes against humanity.

POINT V—The United States violates treaties regarding war and self-determination.

POINT VI—The defendant's freedom should not be restricted before trial.

POINT VII—The venue is improper.

POINT VIII—The defendant was entitled to a hearing before the board.

POINT IX—The indictment should be dismissed.

Upon oral argument of the motion to dismiss the indictment, defendant's counsel pressed defendant's claims that with respect to the war in Viet Nam, the Universal Military Training and Service Act was being "unconstitutionally applied" because Congress had not declared war; "[t]he executive in effect has declared war"; and the intervention of the United States in Viet Nam was in contravention of various treaties and international conventions to which the United States was a party. Upon oral argument, defendant did not press his claims reflected in Points VI, VII and VIII set forth above.[39]

(C) *Denial Of Motion To Dismiss; Continuance Of Trial Because Of Illness Of Defendant's Counsel; Defendant's Dismissal Of Counsel*

(8) At the conclusion of the argument of the motion to dismiss the indictment on September 7, 1965, the Court reserved decision.[40] Later that day the Court denied the motion with a margin endorsement reading: "Motion denied after full argument in open court and after consideration of all briefs on both sides." [41] Counsel on both sides were promptly notified of the denial of the motion.[42]

(9) After the Court announced on September 7, 1965 that it would reserve decision on the motion to dismiss the indictment and just before recessing for the day, the following proceedings took place in open Court and in the presence of defendant: [43]

"THE COURT: The Court will reserve decision on this motion.

MR. LYNN: I received a notice on the assignment of jury selection—we are on for tomorrow.

Now I was talking to the United States Attorney, and Mr. Mitchell lives in Brooklyn and I live in Rockland County, New York. And I wondered, your Honor, if you might not set a certain date that we could come for that jury selection rather than having to come back, and back, every day until it is finally reached.

THE COURT: I would suggest you be here tomorrow. And then of course the Court has not yet acted on this motion, and intends to review again the authorities submitted on both sides before doing so. But without attempting to prejudge that motion, I might say that, if we do go forward with the trial in this case, this Mitchell case, in all likelihood we will get started tomorrow to the extent of selecting a jury in any event.

Of course, if I grant your motion, why, it will be unnecessary. But I think, since it is so close to the head of the calendar, having in mind cer-

---

38. Defendant's Ex. A for identification; Docket Entries for 8/2/65.

39. Tr. 3–10, 9/7/65 [R. 336–343].

40. Docket Entries for 9/7/65; Tr. 14–15, 9/7/65 [R. 347–348].

41. Docket Entries for 9/7/65 [R. 2]; Tr. 6, 23, 9/27/65 [R. 398, 415].

42. Docket Entries for 9/7/65; Tr. 26, 9/27/65 [R. 418].

43. Tr. 14–16, 9/7/65 [R. 347–349]; Tr. 23–28, 9/27/65 [R. 415–420].

tain other cases that have—well, put it this way.

Of the cases that are ready, that will go forward, this case will be very close to the head of the calendar. So I would suggest that both you and your client be here tomorrow, and we will not keep you waiting.[44]

MR. LYNN: All right, your Honor.

MR. OWENS: Thank you, your Honor.

THE COURT: Recess till 10 o'clock tomorrow morning."

(10) September 8, 1965 (Wednesday), prior to opening of Court that day, attorney Lynn telephoned the Court, stated he was ill and would not be able to go forward with the trial of the case that week and requested a continuance. The Court granted a continuance at Lynn's request until the following Monday, September 13, upon the condition that by September 13 either Lynn would be ready to go forward with the trial or he would arrange to have substitute counsel prepared to represent defendant and ready to go forward with the trial.[45]

(11) Upon opening of Court and calling the calendar on September 8, 1965, the Court announced that the trial of the Mitchell case had been continued to September 13 at the request of attorney Lynn and because of his illness. Defendant thereupon stood up and stated, "I am in the midst of dismissing counsel." In response to the Court's question whether Lynn knew he was being dismissed, defendant replied, "No". Defendant requested additional time within which to retain new counsel, stating, "*I do not agree that the issues of my defense are clearcut and simple. I think they involve many things—Nuremberg trials, interna-*tional law, conventions on war crimes and torture and genocide, et cetera. And I think it would take a lot of time for a lawyer to acquaint himself with all of these points of my case.*" [46] (Emphasis added.)

(12) The Court informed defendant that of course he was entitled to counsel of his own choice, but, if he intended to retain substitute counsel, that would have to be done in sufficient time to enable substitute counsel to be ready to proceed with the trial on September 13.[47] In response to the Court's inquiry whether defendant wished to have the Court appoint counsel to serve without fee, he replied in the negative.[48] After some further colloquy, the Court made the following order in open Court in the presence of defendant: [49]

"THE COURT: The Court is going to order as follows: The case, because of Mr. Lynn, who is Mr. Mitchell's attorney of record at this moment—has been from the inception—because of Mr. Lynn's communication to the Court advising the Court of his illness and of his inability on that account to proceed with the trial this week, the case will be continued to Monday, September 13 at 10 A.M. The case will go forward at that time. Mr. Lynn will not be released as counsel in the case unless substitute counsel is obtained.

You are represented by counsel. You will continue to be represented by counsel unless and until you obtain other counsel—which is your privilege if you wish to do so.

The condition, however, that the Court imposes upon substitution of counsel is that he be ready to proceed

---

44. The Mitchell case was No. 6 on the Jury Assignment List for September 8. As a result of pleas and other dispositions in the five preceding cases, the Mitchell case actually was No. 1 on September 8.

45. Docket Entries for 9/8/65; Tr. 2, 9/8/65 [R. 360]; Letter of September 9, 1965 from Court to attorney Lynn, attached to "Order Continuing Trial To Monday, September 13, 1965 At 10 A.M.", filed 9/9/65 [R. 9–12].

46. Tr. 2–3, 7, 9/8/65 [R. 360–361, 365].

47. Tr. 3, 9/8/65 [R. 361].

48. Tr. 5–7, 9/8/65 [R. 363–365].

49. Tr. 8–9, 9/8/65 [R. 366–367].

with the trial of the case on Monday, September 13.

"Under all of the circumstances, in view of the nature of the case, the issues involved, the law involved and the time that this case has been pending in this court, and the time that your matter has been pending before the draft board, this Court believes that it is not only a fair order which the Court is making but it is the only order that the Court can make in good conscience."

(13) September 9, 1965 (Thursday), the Court entered a written order continuing the trial to September 13, "at which time defendant and his present or substituted counsel are ordered to be present and ready to proceed with the trial of the case." Attached to this order was a copy of the Court's letter of September 9, 1965 to attorney Lynn summarizing the events of September 8.[50]

(D) *Assignment Of Court-Appointed Counsel; Defendant's Waiver Of Counsel And Election To Proceed Pro Se*

(14) September 10, 1965 (Friday), the Court, having heard nothing further from defendant or his counsel, Lynn, and being advised that no appearance had been filed by substitute counsel, requested the Clerk of the Court to notify attorney Anthony G. Apicella, a member of the bar of this Court with ample experience in criminal cases, of the possibility that the Court might request him to serve as court-appointed counsel for defendant in the event defendant did not have counsel of his own ready to go forward with the trial on September 13. The Clerk did so notify attorney Apicella on September 10.[51]

(15) Attorney Apicella's qualifications to try a criminal case in the federal court were well known to the Court. He had served for nearly two years in the United States Attorney's office and had handled numerous criminal cases, including ones far more complicated than the instant case. He had been certified by the New Haven County Bar Association for appointment under the Criminal Justice Act and had been designated by the judges of the Connecticut District Court and of the Court of Appeals for the Second Circuit on the respective panels of those courts under the Act. His reputation as an experienced trial lawyer was that of a thorough scholar, painstaking in preparation, articulate in presentation and zealous in the protection of the rights of his client, regardless of which side of a criminal case he was on.[52]

(16) Upon being notified on September 10 of the possibility that he might be appointed by the Court to represent defendant at the trial beginning September 13, attorney Apicella immediately obtained all relevant and available documents in the case, including the indictment, defendant's motion to dismiss the indictment, briefs of both sides on the motion to dismiss and the file. He devoted the balance of Friday, including Friday evening (September 10), the weekend (September 11 and 12) and a portion of Monday (September 13) to a study of the file, the statutes and the applicable law. He thereafter stated in open Court, in the presence of defendant, that "I felt then, and I feel now, that I didn't need sixty days or thirty days or even one week. I was prepared to try the case on Monday."[53]

(17) September 13, 1965 (Monday), upon opening of Court and calling the Mitchell case which was next on the calendar for trial, attorney Lynn stated that "defendant wishes to have other counsel" because of "incompatibility on the way this matter should be presented"; that "I cannot continue where he is unable to pay me a fee—although he did indicate to the Court that he might

50. Docket Entries for 9/9/65; Letter of September 9, 1965 and Order of September 9, 1965, supra note 45 [R. 9–12]; Tr. 5, 9/13/65 [R. 56].

51. Tr. 185, 9/15/65 [R. 236].

52. Tr. 6, 9/13/65 [R. 57]; Tr. 184–185, 189–191, 9/15/65 [R. 235–236, 240–242].

53. Tr. 88, 9/14/65 [R. 139]; Tr. 186, 9/15/65 [R. 237].

be able to pay someone else"; that "he feels that, if he does not have another lawyer, he would feel better if he were permitted to proceed by himself"; that "[t]his is a very intelligent young man and he knows precisely what he wants to do"; "[a]nd that being the case I would respectfully ask the Court to relieve me as counsel in the matter and let this young man proceed as attorney for himself if he has no other lawyer." [54] Attorney Lynn also stated that defendant "tells me this morning that he consulted with another lawyer named Mr. Gruber, and Mr. Gruber was to telephone the Court that he had been consulted on the case." [55]

(18) Attorney Samuel Gruber of Stamford, Connecticut, did telephone the Court prior to the opening of Court on Monday, September 13, and stated that defendant had telephoned him at his home late the previous evening (Sunday, September 12); that defendant inquired whether attorney Gruber would be available to represent him as counsel; that he (attorney Gruber) did not know enough about the case to determine whether he would represent defendant or not; and that due to prior commitments attorney Gruber would not be in New Haven that morning. The Court, in response to attorney Gruber's inquiry, informed him of the status of the case, namely, that it had been ordered to proceed to trial that day; that the Court did intend to proceed with the trial of the case, either with counsel of defendant's selection or with court-appointed counsel; that defendant's present counsel was attorney Lynn and the Court intended to appoint attorney Apicella, if it appeared advisable to do so, to serve either in association with defendant's retained counsel or as his sole counsel if defendant did not have his own counsel; that the

jury would be impaneled that day, after which a recess would be granted for the balance of the day to enable defendant to confer with his counsel, including attorney Gruber if defendant wished to confer with him; and that the Court would welcome attorney Gruber as counsel for defendant if he decided to enter the case. Attorney Gruber replied that, if retained, he would be pleased to work in association with either attorney Lynn or attorney Apicella or both; that he would leave it, if he appeared at the trial, the Court would know he had been retained, and if he did not appear, the Court would know he had not been retained. Attorney Gruber did not appear.[56] The Court recessed early on September 13 specifically "to give this extra opportunity to the defendant to confer with his present court-appointed counsel and to follow up his attempt last night to retain Mr. Gruber if he wishes to do so." [57] Defendant on the following day said that, after the conclusion of the September 13 session of Court, he talked to attorney Gruber but did not request Gruber to appear and represent him in the case.[58]

(19) The Court, for the time being, declined to permit attorney Lynn to withdraw as counsel, in view of the long established practice in this Court of requiring the appearance of substitute counsel before permitting the disappearance of present counsel—as explained in the Court's letter of September 9 to attorney Lynn.[59] The Court accordingly directed attorney Lynn "to remain in attendance until such time as substitute counsel is obtained, if such counsel is obtained by Mr. Mitchell. As a practical matter, that means today to remain through the impaneling of the jury and to render such assistance as you can to Mr. Mitchell in that process." [60]

---

54. Docket Entries for 9/13/65; Tr. 2–3, 9/13/65 [R. 53–54].

55. Tr. 2, 9/13/65 [R. 53].

56. Tr. 4–5, 9, 12, 9/13/65 [R. 55–56, 60, 63].

57. Tr. 77, 9/13/65 [R. 128].

58. Tr. 93–94, 9/14/65 [R. 144–145].

59. Docket Entries for 9/13/65; Tr. 5, 9/13/65 [R. 56]; Letter of September 9, 1965, supra note 45 [R. 10–12].

60. Tr. 5, 9/13/65 [R. 56].
At the end of the day on September 13, the Court excused attorney Lynn from

(20) The Court thereupon appointed attorney Apicella to represent defendant in the case; declared a recess to enable Apicella to confer with Lynn and defendant preparatory to impaneling the jury; and provided a conference room for that purpose.[61]

(21) Defendant requested a further continuance "to consult with lawyers [62]— with Mr. Gruber or any other lawyer I might wish to consult with, in order to have time to secure counsel which I feel I can work with, who I think can represent me properly and *represent the position as I have been trying to defend myself with in this court.*" [63] (Emphasis added.)

(22) The Court explained to defendant that he had been given every opportunity over a period of months to determine who his counsel should be; that counsel of his choice, attorney Lynn, had been granted permission to represent defendant in this Court and had done so from the inception of the case; that defendant had been present with attorney Lynn throughout the lengthy argument on defendant's motion to dismiss the indictment on September 7, during which defendant had indicated satisfaction with his counsel; that the first indication defendant gave of dissatisfaction with his counsel was on the morning of September 8, immediately after the Court denied defendant's motion to dismiss and the very day defendant's trial had been ordered for more than a month to begin, when defendant announced that he intended to dismiss his counsel; that important rights of the government as well as important rights of defendant must be fully protected and both sides were entitled to a prompt trial; that the Court intended to proceed to the extent of impaneling a jury "just as soon as you have had an opportunity, if you wish to avail yourself of it—you may confer further with Mr. Lynn and Mr. Apicella, court-appointed counsel"; and that "[w]hen the jury is impaneled we will recess the case until 10 o'clock tomorrow morning at which time the taking of evidence will begin. You will be given further opportunity in the meanwhile to confer with your counsel and to determine whether you wish any additional counsel in the case." [64]

(23) Defendant rejected both court-appointed counsel, Apicella, and his own counsel, Lynn; he stated, "rather than accept court-appointed counsel or Mr. Lynn's counsel * * * I am left with no alternative but that I would prefer to defend myself. I would not accept any counsel, but proceed myself until I could find someone"; [65] and further, "I would prefer to proceed right now alone. I would not accept court-appointed counsel or Mr. Lynn's counsel." [66]

(24) Pursuant to the suggestion of defendant's own counsel, Lynn, that defendant be "permitted to proceed by himself" [67] and defendant's own preference "to proceed right now alone," [68] the Court asked defendant, "Do I understand correctly that you wish to waive your right

---

further participation in the case. Docket Entries for 9/13/65; Tr. 75–76, 9/13/65 [R. 126–127]. Defendant not only did not object to Lynn's being excused, he insisted upon it: " * * * it is very unfair to him to now make him stay here and consult with me, since I won't be accepting his consultation anyway; where you are keeping him from his regular practice and he would not be working with my case. We know we had differences and I have dismissed him. I think it is unfair imposition on him to keep him here at this point." Tr. 15, 9/13/65 [R. 66].

61. Docket Entries for 9/13/65; Tr. 5–7, 12, 15–16, 9/13/65 [R. 56–58, 63, 76–77].

62. Although defendant from time to time loosely referred to varying numbers of lawyers with whom he conferred or wished to confer, the only one whose name he brought to the attention of the Court was attorney Gruber.

63. Tr. 7, 9/13/65 [R. 58].

64. Tr. 10–12, 9/13/65 [R. 61–63].

65. Tr. 8, 9/13/65 [R. 59].

66. Tr. 9, 9/13/65 [R. 60].

67. Supra, ¶ (17).

68. Supra, ¶ (23).

to counsel, Mr. Mitchell?", to which defendant replied, "Yes." [69] Accordingly, the Court accepted defendant's waiver of counsel but nevertheless ordered attorneys Lynn and Apicella to remain available to defendant: [70]

"The record will show that the waiver of counsel by Mr. Mitchell, which he has insisted upon, is accepted by the Court in the belief that he knows what he is doing, that he is competent to waive counsel and the waiver is intelligently and competently made.

"Despite the waiver of counsel, the Court does order both Mr. Lynn and Mr. Apicella to remain and to be available for such assistance as they can render Mr. Mitchell."

(25) After a recess of an hour and twenty minutes to enable defendant to confer with his counsel, attorney Apicella reported to the Court that he had conferred with defendant and that "The defendant has advised me that he prefers to speak on his own behalf and that he does not want me to speak for him. And of course I advised him that I would concur with that and I would be available for whatever consultation he wanted or whatever information he wanted of me." [71]

(E) *Conduct Of Trial*

(26) Thereafter the trial proceeded with defendant acting pro se,[72] but with counsel at all times present, sitting with him and ready to render effective assistance to the extent defendant wished to avail himself of such assistance.[73] Defendant for the most part during the trial maintained the position that he was neither objecting nor agreeing to the evidence and the proceedings—taking what he referred to as an "inactive role".[74] At one point he indicated he wanted to revoke his waiver of right to counsel, stating that "[m]y waiver of rights was only a reaction in terms of Mr. Lynn or a court-appointed lawyer." [75] The Court ruled as follows:[76]

"THE COURT: I simply will observe—simply note for the record that the record of proceedings this morning in this court, if I recall correctly, noted unequivocally Mr. Mitchell's waiver of his right to counsel.

\* \* \* \* \* \*

"Despite what I understood to be an intelligent and competent waiver of right to counsel, despite Mr. Mitchell's being advised by the Court that he had the right of counsel if he wished to invoke it, that right was waived. And despite the waiver, the Court, as the record will show, did order that Mr. Mitchell's then attorney of record, Mr. Conrad Lynn, remain in the case at counsel table, available to assist Mr. Mitchell in the impaneling of the jury.

69. Tr. 13, 9/13/65 [R. 64].

70. Docket Entries for 9/13/65; Tr. 14, 9/13/65 [R. 65].

71. Tr. 18, 9/13/65 [R. 69].

72. Docket Entries for 9/13/65; Tr. 13, 41, 76, 9/13/65 [R. 64, 92, 127]; Tr. 95, 166, 9/14/65 [R. 146, 217]; Tr. 191, 222, 9/15/65 [R. 242, 273].

73. Tr. 191–192, 9/15/65 [R. 242–243].

74. Tr. 87, 132, 144, 147, 151, 154, 155, 161, 171, 9/14/65 [R. 138, 183, 195, 198, 202, 205, 206, 212, 222].
Defendant's court-appointed counsel specifically advised him of the risks of his so-called "inactive role" (Tr. 186–187, 9/15/65 [R. 237–238]):
"I constantly tried to remind him of one ever-present danger and that was that there was a possibility that this might be his first and last trial on the merits—regardless of how it might go in connection with his claims concerning the counsel issue. I felt that it was in his best interest to proceed with the trial, and told him that I felt it was adequately clear in the record that he was raising his contention and that it was in his best interest to continue with the trial on the merits, because it might be the last time that he would have that opportunity.
"But he refused that counsel and, as you know, proceeded on the basis that he was going to take an inactive role"

75. Tr. 20–24, 9/13/65 [R. 71–75].

76. Tr. 21–22, 9/13/65 [R. 72–73].

"The Court further appointed Mr. Anthony Apicella, a member of the bar of this court, to assist Mr. Mitchell at every stage of the proceedings to the extent that Mr. Mitchell wished to avail himself of such assistance as was made available.

"Now in view of those proceedings, of course any attempt at this time to revoke a waiver which was entered and accepted by the Court as a judicial act, is totally ineffective so far as the Court is concerned."

Actually, defendant participated actively to the extent he considered it to his advantage to do so, including (i) making statements himself in the presence of prospective jurors during the Court's conduct of the voir dire examination of veniremen;[77] arguing his "motion for dismissal and acquittal" at the close of the government's case,[78] after the Court declined to permit defendant "to make this motion before the jury" as he requested;[79] and, after stating that he did not "intend to follow the usual Rules of Federal Criminal Procedure",[80] he did request and obtain from the government, after the jury had been impaneled and before any witnesses had testified, all Jencks Act material in the case, such material being marked for identification at the request of attorney Apicella.[81]

(27) Throughout the trial scrupulous care was exercised to advise defendant of his rights and to protect his rights at every stage of the proceedings,[82] including the following:

(a) The voir dire examination of prospective jurors was more penetrating and comprehensive than the Court normally would have conducted;[83] defendant was informed of his privilege of examining the prospective jurors' questionnaires, of requesting additional questions to be asked of the prospective jurors, and of his right to challenges for cause and peremptory challenges.[84]

(b) Pursuant to attorney Apicella's request as soon as he was appoint-

77. Tr. 35, 37, 9/13/65 [R. 86, 88].

78. Docket Entries for 9/15/65; Tr. 195–208, 210–212, 9/15/65 [R. 246–259, 261–263].

Defendant read this motion from a prepared statement (Tr. 207–208, 9/15/65 [R. 258–259]), reasserting the same claims he had made on his earlier motion to dismiss the indictment (supra, ¶ (7)); indeed, he offered in evidence his printed brief which had been submitted in support of his motion to dismiss and it was marked as an exhibit for identification. Tr. 202–204, 212–215, 9/15/65 [R. 253–255, 263–266]; Defendant's Ex. A for identification. After the Court allowed defendant to argue his motion at length, he concluded by saying, "I was not presenting any arguments in this case." Tr. 211, 9/15/65 [R. 262].

The Court, construing defendant's motion as one for a judgment of acquittal pursuant to Rule 29(a), Fed.R.Crim. P., denied the motion. Tr. 211, 9/15/65 [R. 262]. Later, after his brief had been marked for identification and he had rested, the Court, construing defendant's position to be a motion for judgment of acquittal at the close of all the evidence pursuant to Rule 29(b), Fed.R.Crim.P., denied the motion. Tr. 216–218, 9/15/65 [R. 267–269].

79. Tr. 197, 9/15/65 [R. 248].

80. Tr. 88, 9/14/65 [R. 139].

81. Docket Entries for 9/14/65; Tr. 80–81, 9/13/65 [R. 131–132]; Tr. 86–87, 98–100, 158–159, 176, 9/14/65 [R. 137–138, 149–151, 209–210, 227]; Court Exs. 2 and 3 for identification.

At the beginning of the September 14 session, attorney Apicella stated to the Court (Tr. 86, 9/14/65 [R. 137]):

"Your Honor, yesterday afternoon at approximately 4 o'clock my client, Mr. Mitchell, advised me that he did wish to obtain certain Jencks Act material from the Government if they were going to furnish it.

"We thereafter got together with Mr. Owens and he turned over to us two statements of contemplated witnesses of the Government. * * * Both of which I would request that the Court mark as Court exhibits if the Court would."

82. Tr. 179–180, 9/14/65 [R. 230–231].

83. Tr. 24–75, 9/13/65 [R. 75–126].

84. Tr. 19–20, 60–63, 68, 71, 9/13/65 [R. 70–71, 111–114, 119, 122]; Court Ex. 1 for identification.

ed counsel for defendant, the government agreed to furnish a bill of particulars with respect to the indictment,[85] although defendant's time for moving for a bill of particulars had long since expired.[86]

(c) In addition to the complete file of attorney Lynn which was turned over to defendant,[87] the complete file of the case in the Clerk's office and defendant's complete draft board file (the only exhibit in the case, Govt. Ex. 2) were made available to defendant and his counsel prior to trial.[88]

(d) All Jencks Act material, as noted above, was turned over to defendant and his counsel before any witnesses testified.[89]

(e) Recesses were declared at frequent intervals and at appropriate stages of the proceedings to enable defendant to confer with his counsel and with any other counsel whom he might wish to bring into the case.[90]

(f) Opportunity was afforded defendant to interpose objections to any evidence to which he wished to object; his court-appointed counsel was directed by the Court to stand or raise his hand whenever he thought an objection should be made, at which times defendant was given an opportunity to confer with counsel to determine whether he wished to interpose an objection;[91] witnesses were directed not to answer until the Court could rule on any objection defendant or his counsel wished to make;[92] and defendant's court-appointed counsel throughout the trial did in fact repeatedly follow this procedure.[93]

(g) Even after defendant's draft board file (Govt. Ex. 2) was received in evidence without objection from defendant, the Court informed defendant and his counsel that "[i]f at any time, despite the absence of any objection to this exhibit, there is any desire on the part of the defendant, through his counsel or otherwise, to interpose an objection to any portion of the exhibit, the Court will entertain such objection—at any time during the trial until the evidentiary record is closed."[94]

(h) Before FBI agent Ibbott was permitted to testify to any admissions made by defendant at the time of his arrest on June 1, 1965, an overnight recess was taken to afford defendant and his counsel an opportunity to decide whether they wished to object to such testimony;[95] but no objection was interposed.[96]

(i) Defendant was advised of his right to cross examine the witnesses called by the government;[97] re-

85. Tr. 78, 79–80, 9/13/65 [R. 129, 130–131].

86. Rule 7(f), Fed.R.Crim.P.

87. Tr. 78, 9/13/65 [R. 129].

88. Tr. 78–79, 9/13/65 [R. 129–130]; Govt. Ex. 2.

89. Supra, ¶ 26.

90. Tr. 3, 4–5, 6, 8–9, 10, 9/8/65 [R. 361, 362–363, 364, 366–367, 368]; Tr. 4, 6–7, 12, 15–16, 18, 76–78, 9/13/65 [R. 55, 57–58, 62, 66–67, 69, 127–129]; Tr. 112–113, 158–159, 175–176, 9/14/65 [R. 163–164, 209–210, 226–227].

91. Tr. 95–96, 115–116, 9/14/65 [R. 146–147, 166–167].

92. Tr. 102, 9/14/65 [R. 153].

93. Tr. 106–107, 109, 112, 113, 116, 118–119, 120–121, 123, 124, 125–126, 130, 132, 140, 143–144, 145, 146–147, 151, 153–154, 160–162, 171, 9/14/65 [R. 157–158, 160, 163, 164, 167, 169–170, 171–172, 174, 175, 176–177, 181, 183, 191, 194–195, 196, 197–198, 202, 204–205, 211–213, 222]; Tr. 194, 9/15/65 [R. 245].

94. Tr. 117, 9/14/65 [R. 168].

95. Tr. 175–176, 9/14/65 [R. 226–227]

96. Tr. 193–194, 9/15/65 [R. 244–245].

97. Tr. 96–97, 158, 179–180, 9/14/65 [R. 147–148, 209, 230–231].

cesses were taken to enable defendant and his counsel to prepare to cross examine;[98] but in each instance cross examination was refused.[99]

(j) Defendant was advised repeatedly of his right to call witnesses, to introduce exhibits and to have them subpoenaed;[100] but he declined to present any evidence,[101] with the exception of his 37 page printed brief which was marked for identification.[102]

(k) Defendant was advised of his right to make appropriate motions at the close of the government's case and at the close of all the evidence;[103] and he availed himself of that right.[104]

(l) Defendant was advised of his right to present argument to the jury at the close of the evidence;[105] he declined and refused to permit his counsel to do so, stating "In fine, I have nothing to say to the jury."[106] At the conclusion of the government's argument to the jury, the Court again offered defendant the opportunity, either through counsel or himself, to argue to the jury;[107] again defendant declined, but only after repeating—in the presence of the jury—his oft-rejected claim that his defense was based on "the issues of Viet Nam, Dominican Republic and American crimes around the world, and the issues of the Nuremberg trials, in the principle that the individual has an individual responsibility to disassociate, regardless of the laws of his nation, from any crimes that his Government commits."[108]

(m) Defendant was advised of his right to submit requests to charge to the Court (which defendant asked the Court to explain)[109] and of his right to take exceptions to the charge after it had been given;[110] defendant declined to exercise either right and refused to permit his counsel to do so.[111]

(n) During the trial, the Court, in addition to advising defendant of his rights and affording him full opportunity to exercise them, on its own motion acted whenever possible to assure maximum fair treatment of defendant, including (i) striking and instructing the jury to disregard evidence of a personal history form presumably sent to defendant with his induction order on December 14, 1964 (since the witness could not "swear that one of those was included on that date with that order");[112] suggesting to government counsel that certain ques-

98. Tr. 158, 179–180, 9/14/65 [R. 209, 230–231].

99. Tr. 165–166, 9/14/65 [R. 216–217]; Tr. 194–195, 9/15/65 [R. 245–246].

100. Tr. 177–179, 9/14/65 [R. 228–230]; Tr. 203, 9/15/65 [R. 254].

101. Tr. 212, 9/15/65 [R. 263].

102. Docket Entries for 9/15/65; Tr. 202–203, 213–215, 9/15/65 [R. 253–254, 264–266]; Defendant's Exhibit A for identification; supra, ¶ (7).

103. Tr. 179–180, 9/14/65 [R. 230–231]; Tr. 195–203, 216–218, 9/15/65 [R. 246–254, 267–269].

104. Supra, note 78.

105. Tr. 180, 9/14/65 [R. 231]; Tr. 221–223, 9/15/65 [R. 272–274].

106. Tr. 223, 9/15/65 [R. 274].

107. Tr. 235–236, 9/15/65 [R. 286–287].

108. Tr. 236–237, 9/15/65 [R. 287–288].

109. Tr. 218–220, 9/15/65 [R. 269–271].

110. Tr. 263–265, 9/15/65 [R. 314–316].

111. Tr. 220, 264, 9/15/65 [R. 271, 264]. Attorney Apicella, as an officer of the Court, did direct the Court's attention to an inadvertent statement in its charge that the burden was on the *defendant* of proving that he is guilty. Tr. 241, 264–265, 9/15/65 [R. 292, 315–316]. The Court called the jury back and corrected this misstatement before it began to deliberate. Tr. 267–270, 9/15/65 [R. 318–321].

112. Tr. 150–151, 9/14/65 [R. 201–202].

tions be reframed, even absent objection by defendant;[113] examining the witness Moriarty, clerk of the Local Board, at the conclusion of the government's direct examination, to be sure of the completeness of defendant's draft board file received in evidence (Govt. Ex. 2);[114] excusing a juror, absent any motion to do so, who had engaged in a brief conversation with the witness Moriarty during a recess;[115] and, in its charge, urging the jury, in view of the circumstances under which the case was tried, to be scrupulously fair with defendant,[116] including searching defendant's draft board file for evidence which might reflect favorably upon defendant's position.[117]

(28) September 15, 1965 (Wednesday), the third day of trial, the case was submitted to the jury in the early afternoon.[118] After an hour of deliberation, the jury returned a verdict of guilty[119] which was confirmed by a poll of the jury conducted on the Court's own motion.[120] Following discharge of the jury, the government moved for immediate imposition of sentence.[121] The Court, unable to obtain any assurance from defendant that he would cooperate with the probation officer if a pre-sentence investigation and report were ordered[122] and in view of defendant's position of "no objection or agreement" to immediate imposition of sentence,[123] did impose sentence forthwith, after affording defendant an opportunity to confer with counsel and to be heard, through counsel and directly, on the matter of sentence, which he refused.[124] After imposing sentence, the Court directed defendant's court-appointed counsel to file a notice of appeal the following day;[125] ordered that a $5,000 surety bond be furnished as bail pending appeal (after defendant argued there was no necessity for bail);[126] advised defendant of his right to file post-conviction motions;[127] and offered him the assistance of counsel in preparing and presenting such motions, which offer was refused.[128]

(F) *Defendant's Post-Conviction Motion; Appearance And Argument By Counsel For New Haven Civil Liberties Council*

(29) September 20, 1965, defendant, appearing pro se, filed a motion for judgment of acquittal, or arrest of judgment, or a new trial, claiming (i) the Court should have granted his motion for acquittal at the conclusion of the evidence, (ii) the indictment did not charge an offense, (iii) defendant was denied the right to counsel in violation of the Fifth and Sixth Amendments of the United States Constitution and (iv) defendant was denied due process in violation of the Fifth Amendment. Defendant did not request a hearing on this motion. The Court denied the motion September 21.[129]

(30) September 22, 1965, the New Haven Civil Liberties Council filed a mo-

113. Tr. 153–156, 9/14/65 [R. 204–207].

114. Tr. 166–170, 9/14/65 [R. 217–221].

115. Tr. 127–138, 9/14/65 [R. 178–189].

116. Tr. 257–259, 9/15/65 [R. 308–310].

117. Tr. 247–249, 9/15/65 [R. 298–300].

118. Docket Entries for 9/15/65; Tr. 270, 9/15/65 [R. 321].

119. Docket Entries for 9/15/65; Tr. 271–273, 9/15/65 [R. 322–324].

120. Tr. 273–276, 9/15/65 [R. 324–327].

121. Tr. 2, 9/15/65 [R. 370].

122. Tr. 2–10, 9/15/65 [R. 370–378].

123. Tr. 4, 7, 9, 10, 9/15/65 [R. 372, 375, 377, 378].

124. Docket Entries for 9/15/65; Tr. 4, 8, 12–14, 9/15/65 [R. 372, 376, 380–382].

125. Docket Entries for 9/15/65; Tr. 19–20, 9/15/65 [R. 387–388].

126. Docket Entries for 9/15/65; Tr. 20–22, 9/15/65 [R. 388–390].

127. Tr. 3, 5, 9, 23, 9/15/65 [R. 371, 373, 377, 391].

128. Docket Entries for 9/15/65; Tr. 23–24, 9/15/65 [R. 391–392].

129. Docket Entries for 9/20/65 and 9/21/65 [R. 21].

tion for permission as amicus curiae to file a brief and present oral argument on the issue (denial of right to counsel) raised by the third paragraph of defendant's post-conviction motion filed September 20, which motion had been denied September 21. The Court, construing the NHCLC's motion as one requesting reconsideration of the Court's determination of the issue raised by the third paragraph of defendant's September 20 motion in addition to the permission requested by the NHCLC, entered an order September 22 granting the motion and setting oral argument September 27, following exchange and filing of briefs.[130]

(31) September 27, 1965, the Court heard full argument by counsel for the NHCLC (William K. Muir, Jr., Esq.) and counsel for the government on the NHCLC's motion, at the conclusion of which the Court denied the motion for a new trial on the ground stated in the third paragraph of defendant's post-conviction motion of September 20 (denial of right to counsel) and announced the Court would adhere to its original September 21 determination of that issue. A formal order was entered accordingly September 28.[131]

(32) During the argument on September 27 of the NHCLC's motion, its counsel, attorney Muir, made the suggestion that the Court grant a new trial on the conditions that defendant be ready to proceed with retained counsel within a week or two and that he agree to have the case tried upon the four issues stated by the Court as the only ones involved, excluding the issues rejected by the Court in denying his motion to dismiss the indictment: [132]

"MR. MUIR:

\*　　\*　　\*　　\*　　\*　　\*

"We are also convinced that there is one difficult problem, and that is that there are indications that Mr.

Mitchell, even were he granted a new trial, might continue to obstruct the Court by continuing to come in and delay the Court—might continue to come in and say, 'I have not got counsel and I need a delay.'

"And may I suggest, respectfully, that this problem can be dealt with if the Court will not grant our motion now but, in the event that Mr. Mitchell is ready to come forward within a week, a week from today, with adequate counsel, is willing to go forward and be served by this counsel, that this motion be granted; that it be denied if Mr. Mitchell cannot come up with adequate counsel, that the motion be denied if he continues to obfuscate the issues or continues to delay the case or continues to exercise those traits of behavior which will cause justice not to be administered properly but to use justice or misuse the procedures and place of justice in this city, for his own purposes and for irrelevantly legal purposes.

\*　　\*　　\*　　\*　　\*　　\*

"I also feel strongly that a motion such as the one that I originally suggested, in which the Court would say that this motion would be dismissed unless the defendant Mitchell appears with counsel of his own choice and represents to the Court that he is going to cooperate with his counsel and is going to accept the requirements that the law sets upon these episodes in order to get to the heart of the issue—unless he does this, the motion is dismissed."

In response to the Court's inquiry whether defendant was aware of this proposal, attorney Muir replied:[133]

"MR. MUIR: Mr. Mitchell and I talked on the telephone last night,

---

130. Docket Entries for 9/22/65 [R. 22, 23–24].

131. Docket Entries for 9/27/65 and 9/28/65 [R. 47–48]; Tr. 1–56, 9/27/65 [R. 393–448].

132. Tr. 18–19, 30–31, 9/27/65 [R. 410–411, 422–423].

133. Tr. 31–32, 9/27/65 [R. 423–424].

at which time I asked him, 'Mr. Mitchell, have you got counsel in the event that this Court, of its own responsibility, decides to give you a new hearing?'

"Mr. Mitchell told me that he had counsel—that he had contacted counsel, that he had an acquiescence from counsel but he had no formal commitment by counsel as of last night at 10 o'clock; but that he would go ahead and that the formal commitment should be obtained today.

"I have not told him—I suggest this formal motion to you. I have told him, though, that he could not possibly expect more than two weeks, and I have only told him two weeks, two weeks in which to get counsel and to try this case; and that no court should be expected in a case of this sort to grant a continuance of longer than two weeks time.

"That is the gist of the communication between myself and Mr. Mitchell."

The following colloquy thereupon took place between the Court and attorney Muir: [134]

"THE COURT: What I would be most interested to know, if you can shed any light on it, is whether—just assuming for argument's purposes, for purposes of argument—that the Court were disposed to grant a new trial—given two weeks in which to retain counsel of his own choice; he would be prepared at the end of two weeks to go forward.

"What I am getting at is this. Are you in a position to apprise the Court as to whether Mr. Mitchell would intend in that situation to continue to press upon this Court, as part of his defense, the claims that have already been rejected by the Court on his motion to dismiss the indictment, including the claims that the United States is engaged in war crimes in Viet Nam and San-

to Domingo; and the Nuremberg trial—the Nuremberg doctrine in some way has relevance here; or has he seen the light and does he recognize that the issue, only issue in this case as far as the trial court is concerned, having ruled upon the motion to dismiss the indictment, is whether the defendant wilfully failed to report for induction pursuant to a valid order of the local draft board No. 17 in Norwalk?

"MR. MUIR: I would be prepared to undertake the responsibility to tell him how the issue of Nuremberg trials and Viet Nam is being treated by this Court, that the issue has been decided by the Court on the law side, that if the Court turns out to be wrong on appeal to the Second Circuit Court of Appeals he will then have a chance to introduce such material but the Judge has stuck his neck out, so to speak, by denying him an opportunity at the outset to adduce this material. If the Judge proves to be wrong, the Second Circuit Court of Appeals will so inform him; and that the issues now, because the Judge has taken responsibility to narrow the issues to these four factual questions of whether there was a letter which was sent to Mr. Mitchell, whether it had been effectively delivered, whether he failed to show up to the South Norwalk Selective Service board or some adequate substitute, and whether it was wilfulness on his part in refusing to show up— these are the issues on which he must accept trial. Otherwise, he will be in danger of being held in contempt if he obfuscates the issues in any other way, other than the ground rules laid down by the Court in denying the motion to dismiss in the original hearing on September the 7th.

"THE COURT: Well, the short of it is, without belaboring this,

134. Tr. 32–36, 9/27/65 [R. 424–428].

Mr. Muir, as I understand it you say that you would undertake to so advise Mr. Mitchell, but you are not in a position to tell the Court what Mr. Mitchell's position on this is, in other words, whether he would accept your advice.

"MR. MUIR: I am a telephone call away from being able to have an answer of the state of mind of Mr. Mitchell at the present time on this question that you raise. And it seems to me a worthwhile question to get an answer, if it only involves a telephone call to Mr. Mitchell in Brooklyn.

"THE COURT: Before I respond to that, I think it is only fair to note, as the record bears out, that at least one of Mr. Mitchell's counsel, that is, Mr. Apicella, squarely advised him almost on all fours in that regard during the trial. And I·think Mr. Apicella once—at least twice, as I recall—said that he had reminded Mr. Mitchell that he might very well be waiving his right to trial, any further trial if he continued to press those claims which had been rejected.

"The short of it is that I am satisfied that during the proceedings leading up to Mr. Mitchell's conviction he was apprised by at least Mr. Apicella, and undoubtedly other counsel whom he consulted, that those claims had no place in this case in view of the Court's ruling on the motion to dismiss the indictment.

"I would be interested, at least to the extent of having the record as complete as possible on this point —to afford you the opportunity which you have said you would like to have, if Mr. Mitchell is no further than a phone call away—to ascertain the answer to that question that I put.

"I am wondering if there would be any objection on the part of Government counsel if we recessed at this point until 2 o'clock.

"I will give Mr. Muir an opportunity to obtain that information if he can, and then I will hear the Government in opposition to the motion at 2 o'clock."

After the noon recess, Mr. Muir reported back to the Court that he had talked to defendant who "then had to talk with counsel"; that Mr. Muir had "presented to Mr. Mitchell the sum and substance of the representation which [the Court] wished to seek from him, namely two: that he would have counsel and would be ready to proceed with trial within a week or two, and secondly that he would not raise issues that had been closed by the decision of the Court on the motion to dismiss, in particular the issues of Nuremberg and the issues of the criminality of the United States Government's activities in the Dominican Republic, Viet Nam and in Cuba"; that at that point defendant said, "I am in a dilemma. I have not been able to reach counsel and I do not want to be able to foreclose myself on ground—when I do not know enough about the law to make a reasonable decision"; that defendant's "own inclination was that he was, 'bargaining on the issues' "; and that "there is no commitment on the part of Mr. Farmer nor on the part of Mr. Boudin to undertake Mr. Mitchell's cause". [135]

(33) One month later, October 25, 1965, Fyke Farmer, Esq. of Nashville, Tennessee, filed his appearance in the District Court as counsel for defendant on appeal. [136]

(G) *Conclusions As To Issues On Motion To Dismiss Indictment And Their Relation To Defendant's Right To Counsel*

■■■ (1) The legal issues raised by defendant's motion to dismiss the indictment were without merit; [137] after a full

135. Tr. 38–40, 9/27/65 [R. 430–432].

136. [R. 50].

137. See authorities cited at pp. 897–901, infra.

hearing and consideration of briefs on both sides, the motion was properly denied.

(2) Such legal issues, having been fully briefed and argued before trial and having been decided by the District Court adversely to defendant (subject to his rights on appeal), were not properly before the Court and jury on the trial of the case on its merits.

(3) Defendant was not denied his right to counsel.

(a) He was represented by counsel, or had available the effective assistance of counsel—either retained counsel, court-appointed counsel, or both—at every stage of the proceedings.

(b) He led the Court to believe, by his words and conduct, that he wanted to waive his right to counsel and to defend himself pro se.

(c) He nevertheless was provided with competent court-appointed counsel who was available to defendant throughout the trial and who in fact advised defendant throughout the trial.

(d) He had a reasonable opportunity, under the circumstances of this case, to retain substitute counsel even after dismissal of his retained counsel on the day the case had been assigned for trial.

(4) Defendant had a fair trial, scrupulous care having been exercised to advise him of his rights and to protect his rights at every stage of the proceedings.

## OPINION

### I.

### ISSUES RAISED ON MOTION TO DISMISS INDICTMENT

(A) *Constitutionality Of Draft Law As Applied*

■ Defendant claimed that with respect to the war in Viet Nam the Universal Military Training and Service Act is being unconstitutionally applied because Congress has not declared war; that the executive in effect has declared war; and that the intervention of the United States in Viet Nam is in contravention of various treaties and international conventions to which the United States is a party.[138]

These contentions are wholly without merit and have been repeatedly and consistently rejected by the courts of the United States.

[7] Congress has the power to conscript for service in the land, naval and air forces of the United States in time of war and in time of peace. U.S. Const. art. I, § 8, cls. 12, 13, 18; Selective Draft Law Cases, Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918); Cox v. Wood, 247 U.S. 3, 38 S.Ct. 421, 62 L.Ed. 947 (1918); Hamilton v. Regents of University of Cal., 293 U.S. 245, 262, 55 S.Ct. 197, 79 L.Ed. 343 (1934); United States v. Herling, 120 F.2d 236 (2 Cir. 1941), affirming United States v. Rappeport, 36 F.Supp. 915 (S.D.N.Y.1941); United States v. Bolton, 192 F.2d 805 (2 Cir. 1951); United States v. Lambert, 123 F.2d 395 (3 Cir. 1941); Warren v. United States, 177 F.2d 596, 598–599 (10 Cir. 1949); United States v. Henderson, 180 F.2d 711, 713 (7 Cir. 1950), cert. denied, Henderson v. United States, Wildeman v. United States, Shufflebarger v. United States, and Frantz v. United States, 339 U.S. 963, 70 S.Ct. 997, 998, 94 L.Ed. 1372 (1950); Richter v. United States, 181 F.2d 591, 592–593 (9 Cir. 1950), cert. denied, 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647 (1950); Stone v. Christensen, 36 F.Supp. 739 (D.Ore. 1940); United States v. Cornell, 36 F. Supp. 81 (D.Ida.1940); cf. United States ex rel. Bergdoll v. Drum, 107 F.2d 897, 901, 129 A.L.R. 1165 (2 Cir. 1939).

Defendant's contention that the Act is being unconstitutionally applied because conscripted men are being used to fight a war in Viet Nam undeclared by Congress and in effect declared by the executive, does not appear to have been passed upon by any court in the context of the Viet Nam war. In the context of the

138. Tr. 3–10, 9/7/65 [R. 336–343]; Defendant's Ex. A for identification.

Korean war, however, a similar contention was squarely rejected by the Court of Appeals for this Circuit in United States v. Bolton, supra, 192 F.2d at 806; cf. United States v. Herling, supra. This Court, in denying defendant's motion to dismiss the indictment, rejected defendant's contention with respect to the Viet Nam war, upon the authority of Bolton and Herling, and that ruling is here specifically confirmed.

■ Section 6 of the United Nations Participation Act of 1945, 22 U.S.C. § 287d, authorizes the President, pursuant to a Congressionally approved agreement with the United Nations, to send men abroad to fight without a specific mandate from Congress. While Congress has not formally declared war with respect to the military action in Viet Nam, nor did it in Korea, it has given its wholehearted approval to the action of the President by appropriations and other implementing legislation. The President, as Commander-in-Chief, has always exercised the power to begin hostilities; viewed realistically, most of our wars have been in full course before Congress has gotten around to a formal declaration. Prize Cases, The Brig Amy Warwick, 67 U.S. (2 Black) 635, 665–671, 17 L.Ed. 459 (1862). Unquestionably the President can start the gun at home or abroad to meet force with force; he is not only authorized but bound to do so. Id. at 668. And under our established concept of international dependence and foreign commitments, this power must extend to repelling attacks upon our allies which threaten our own security.

■ To read into the provision of the Constitution empowering Congress to raise and support armies, U.S.Const. art. I, § 8, cl. 12, a limitation forbidding conscription in time of peace, or in time of cold war or at any time short of a formal declaration of war, would render Congress helpless to prepare in advance against the danger of war. See Hamilton v. Regents of University of Cal., supra, 293 U.S. at 262–263, 55 S.Ct. at 204; United States v. Herling, supra. This firmly established principle of constitutional law has been well summarized by Judge Phillips (construing the Selective Service Act of 1948) in Warren v. United States, supra, 177 F.2d at 599:

> "Congress has power to raise armies by conscription in time of peace as well as in time of war. The power to do so is essential to the national security. We must accept as true the recitals of Congress in the Act. Moreover, we can take judicial notice that when the Act was passed, the balance between peace and war was so delicate that no one could forecast the future with certainty and that our national security required the maintenance of adequate military, air, and naval establishments and that, without such establishments, our survival as a nation of free and independent people would be in jeopardy. Congress has power to prepare against an enemy, actual or potential. It is not required to postpone that preparation until a time when it would be too late."

■ Finally, defendant lacks standing to claim that the Act is being unconstitutionally applied in drafting him to go to Viet Nam to fight an "undeclared war". He stands guilty of the felony of refusing to report for induction. Had he been inducted, he might never have been sent abroad, much less to Viet Nam. Until inducted and ordered to Viet Nam, his claim of unconstitutional application of the Act is premature. United States v. Bolton, supra, 192 F.2d at 806.

(B) *Defendant's Political Or Philosophical Views*

■ In support of his motion to dismiss the indictment, defendant asserted that the individual must disassociate himself from the war crimes of his government; that the United States is committing crimes against peace; that United States authorities and their agents are committing war crimes and crimes against humanity; and that the United

States violates treaties regarding war and self-determination.[139]

Leaving aside the sickening spectacle of a 22 year old citizen of the United States seizing the sanctuary of a nation dedicated to freedom of speech to assert such tommyrot and leaving aside also the transparency of his motives for doing so, the decisive point is that such political or philosophical views,[140] even if sincerely entertained, are utterly irrelevant as a defense to the charge of willful refusal to report for induction in the armed forces of the United States and as a basis for challenging an indictment so charging. United States v. Madole, 145 F.2d 466, 467–468 (2 Cir. 1944) ("scruple, however tender we may be towards it, must have a limit, when it stands in the path of a vital national purpose.") ; cf. Hamilton v. Regents of University of Cal., supra, 293 U.S. at 262–265, 55 S.Ct. at 204–205; Jacobson v. Com. of Massachusetts, 197 U.S. 11, 29, 25 S.Ct. 358, 49 L.Ed. 643 (1905). In the Jacobson case, Mr. Justice Harlan stated (Id. at 29, 25 S.Ct. at 362) :

> "There is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable

regulations, as the safety of the general public may demand.

\* \* \* \* \* \*

> "The liberty secured by the 14th Amendment, this court has said, consists, in part, in the right of a person 'to live and work where he will' (Allgeyer v. [State of] Louisiana, 165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832] ; *and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense.*" (Emphasis added.)

(C) *Bail Restrictions*

 Defendant was restricted, by the terms of the Court's order enlarging him on bail, to the Eastern District of New York (where he lived), the Southern District of New York (where his retained counsel had his office) and the District of Connecticut (where he refused to report for induction and was to be tried). At the time of arraignment, his counsel requested that the Court "remove all bail limits, that he be permitted to travel freely, without restriction" because "defendant \* \* \* as part of his activity \* \* \* has been invited to speak in various states." [141] On his motion to dismiss the indictment, he renewed this claim, stating, "the cause of the accused is national" and demanding that "this accused [be allowed] full liberty of movement before trial." [142]

 The relevance of such a claim to a motion to dismiss the indictment was at best doubtful. The point in any event has been ruled on in United States v.

---

139. Defendant's Ex. A for identification.

140. The record discloses that it was precisely because of his insistence upon conveying this "political message" as his defense at the trial of this case that defendant dismissed his retained counsel on the very day the case had been assigned for trial—"in order to convey it [his political message] better and more emphatically he must have counsel other than Mr. Lynn"

(Tr. 21, 9/27/65 [R. 413])—"This is a case in which Mr. Mitchell needed counsel \* \* \* to make his political argument" (Tr. 29, 9/27/65 [R. 421]).

141. Docket Entries for 6/14/65; Tr. 1–9, 6/14/65 [R. 350–358]; Tr. 42, 9/13/65 [R. 93].

142. Defendant's Ex. A for identification, p. 32.

Foster, 278 F.2d 567, 570 (2 Cir. 1960), cert. denied, 364 U.S. 834, 81 S.Ct. 48, 5 L.Ed.2d 60 (1960), where the Court held that "The propriety of imposing territorial limitations as a condition of granting release on bail cannot be doubted, nor can the court's power in its discretion to expand the limits originally fixed."

(D) *Venue*

■ As a further ground in support of his motion to dismiss the indictment, defendant urged that venue was improperly laid in the District of Connecticut, in violation of his rights under U.S.Const. art. III, § 2, cl. 3 and Amends. V (due process clause) and VI (venue clause). In the alternative, he moved for change of venue to the Eastern District of New York, insisting "that as a New York radical he be tried in New York." [143]

The Court, in denying his motion to dismiss the indictment, rejected his claim of improper venue for the reasons stated at p. 877 supra. The location of the Local Board (Norwalk, Connecticut) having jurisdiction over defendant's place of residence (New Canaan, Connecticut) at the time he originally registered has continuing jurisdiction over him.[144] Selective Service Regulations, § 1613.12(a), 3 C.F.R. 1613.12(a). The Local Board with which he was registered and to which he failed to report for induction is the situs of the offense here charged.

United States v. Anderson, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946). The fact he was living outside of the District of Connecticut at the time he failed to report for induction is irrelevant upon the issue of venue. Jones v. Pescor, 169 F.2d 853, 855 (8 Cir. 1948); cf. Johnston v. United States, 351 U.S. 215, 220–221, 76 S.Ct. 739, 100 L.Ed. 1097 (1956).

(E) *Automatic Hearing Before Local Board*

■ Finally, defendant claimed the indictment should have been dismissed because the Local Board omitted "a vital process" in not granting him an automatic hearing despite his failure at any time to have requested a hearing; he asserts that "The fact that the objectant may not have specifically requested a hearing is immaterial." [145] Conceding that at no time was he engaged in a dispute with the Board concerning his classification, he states, "That the defendant was not seeking classification does not justify the government's failure to propose a hearing in which the defendant could have presented his position and in which he would have attempted to persuade his draft board of the criminality it pursues." [146]

This claim is frivolous. Denying the authority of the Local Board to classify him at all,[147] he nevertheless urges that

---

143. Defendant's Ex. A for identification, p. 34.

 Upon oral argument of his motion to dismiss the indictment, defendant did not press his claims discussed here under sections (C), (D) and (E) relating to bail restrictions, venue and automatic hearing before local board. Tr. 3–10, 9/7/65 [R. 336–343]. Since these claims were included in his brief submitted on that motion (Defendant's Ex. A for identification, Points VI, VII and VIII), the Court did consider them and ruled on them in denying the motion.

144. Defendant's assertion on his motion to dismiss the indictment that "The accused and his counsel raised the question of jurisdiction with the local board more than a year ago but received no response" (Ibid.) is flatly contradicted by the record. Supra note 19; Letter of June 3,

1964 from Local Board to Conrad J. Lynn, Esq., Govt. Ex. 2, Document No. 18.

145. Defendant's Ex. A for identification, p. 35.

146. Ibid.

147. After registering with Local Board No. 17 (supra note 8), he failed to fill out and return his classification questionaire to the Board (supra note 10). Upon receiving his first delinquency notice and a IA classification card (which notified him of his right to a hearing before the Board if requested in writing within 10 days), he wrote to the Board *returning* his classification card, stating that he was *refusing* it and enclosing his statement of *disaffiliation* from Selective Service (supra notes 11–15). The second IA

its failure to permit him to persuade it of "the criminality it pursues" deprived him of a "vital process". This is part of the same cloth out of which he has spun his claim that, having allegedly been denied the right to counsel at the trial he spurned, he nevertheless should be granted a new trial so that he can try again to peddle upon the Court the notion that the so-called "war crimes", "crimes against peace" and "crimes against humanity" which he thinks are being committed by the United States afford him a defense against the crime of refusal to report for induction in the armed forces of the United States.

■ His reliance upon Selective Service Regulations, § 1626.25, 32 C.F.R. 1626.25, as a basis for his claim that he was entitled to an automatic hearing before the Board without requesting it, is misplaced. This section applies only to a conscientious objector's claim; it provides for a hearing by the Department of Justice when an appeal board tentatively determines that a registrant is not entitled to classification as a conscientious objector. Defendant at no time claimed to be a conscientious objector; when invited by the Local Board to fill out a special form for a conscientious objector, he flatly refused to do so. Supra note 16.

Defendant would have been entitled to an opportunity to appear in person before the Local Board if he had requested such opportunity within 10 days after his classification notices were sent to him. Selective Service Regulations, § 1624.1, 32 C.F.R. 1624.1. He made no such request at any time.[148]

Each of the issues raised by defendant's motion to dismiss the indictment being without merit, the motion, after full hearing and consideration of briefs, was denied.

## II.

## DEFENDANT WAS NOT DENIED HIS RIGHT TO COUNSEL

### (A) *Applicable Law*

■ The Court having upheld the constitutionality of the Universal Military Training and Service Act as applied and having rejected defendant's other claims with respect to the sufficiency of the indictment, there can be no serious question regarding the sufficiency of the evidence to establish his guilt beyond a reasonable doubt. The situation here presented is parallel to that which was before the Court of Appeals for this Circuit in an earlier case involving violations of the Selective Training and Service Act of 1940. United States v. Herling, 120 F.2d 236 (2 Cir. 1941), affirming United States v. Rappeport, 36 F. Supp. 915 (S.D.N.Y.1941). There the Court of Appeals, after upholding the constitutionality of the application of that Act absent a formal declaration of war, concluded (Id. at 236–237):

"The indictments were adequate to give fair notice of the crime charged (citation omitted); there was no reason for a continuance to procure evidence as to an emergency vel non, since that was irrelevant to the validity of the law; and the trials of those accused who did not eventually plead guilty were as fair and adequate as possible under the circumstances of obstruction which the accused felt themselves obliged to present. Indeed, appellants' guilt was indisputable once the Act was found valid."

The only remaining claim raised by defendant on his post-conviction motion for a judgment of acquittal or a new trial which merits consideration is his claim that he was denied the right to counsel in violation of the Sixth Amendment, U.S.Const. amend. VI (Assistance of

---

classification card sent to defendant (again notifying him of his right to a hearing before the Board) was not returned by him (supra notes 17 and 18).

He never requested a hearing before the Board (supra note 19).

148. Tr. 118, 9/14/65 [R. 169].

Counsel clause), and the Fifth Amendment, U.S.Const. amend. V (due process clause).

The right to assistance of counsel is absolute. Powell v. State of Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); United States v. Morgan, 222 F.2d 673, 674 (2 Cir. 1955). But the exercise of that right is subject to the necessities of sound judicial administration, United States v. Arlen, 252 F.2d 491, 494 (2 Cir. 1958), and the right itself, being personal, may be waived. Johnson v. Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942); United States v. Arlen, supra, 252 F.2d at 494.

The scope of sound discretion in the District Court to determine to what extent a continuance should be granted to enable a defendant to retain counsel in a criminal case has been stated by the Court of Appeals for this Circuit in the Arlen case as follows (252 F.2d 491, 494–495):

"We think it clear that although a defendant able to retain counsel is entitled to a reasonable time to secure counsel, he may not indefinitely postpone trial by continued applications for more time to seek representation. Whether additional time should be granted is within the sound discretion of the trial court. Further, where a defendant able to retain counsel has been advised by the court that he must retain counsel by a certain reasonable time, and where there is no showing why he has not retained counsel within that time, the court may treat his failure to provide for his own defense as a waiver of his right to counsel and require such defendant to proceed to trial without an attorney. Such a waiver is similar in its consequences to an election made by an indigent defendant.

\* \* \* \* \* \*

"The orderly administration of justice does not permit unlimited delays in order that a defendant may secure counsel. \* \* \* To what extent continuances for that purpose should be granted is within the sound discretion of the District Court, and a refusal is justified if the defendant has had a reasonable opportunity to obtain representation."

The Supreme Court in Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), in holding that five days within which to retain counsel was not constitutionally inadequate, again affirmed the rule that the matter of continuance is traditionally within the discretion of the trial judge (Id. at 589–590, 84 S.Ct. at 849–850):

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Avery v. [State of] Alabama, 308 U.S. 444 [60 S.Ct. 321, 84 L.Ed. 377]. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. Chandler v. Fretag, 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4]. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. Nilva v. United States, 352 U.S. 385, [77 S.Ct. 431, 1 L.Ed.2d 415]; Torres v. United States, 270 F.2d 252 (C.A. 9th Cir.); cf. United States v. Arlen, 252 F.2d 491 (C.A. 2d Cir.).

\* \* \* \* \* \*

"We cannot say that this decision, in light of all the circumstances, denied petitioner due process. The five days' notice given petitioner was not a constitutionally inadequate time to hire counsel and pre-

pare a defense to a case in which the evidence was fresh, the witnesses and the evidence readily available, the issues limited and clear-cut and the charge revolving about one statement made by Ungar during a recently completed trial. Furthermore, the motion for continuance was not made until the day of the scheduled hearing and Ungar himself was a lawyer familiar with the court's practice of not granting adjournments."

Accord: Leino v. United States, 338 F.2d 154 (10 Cir. 1964); Relerford v. United States, 309 F.2d 706 (9 Cir. 1962); Arellanes v. United States, 302 F.2d 603, 609–610 (9 Cir. 1962), cert. denied, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962); Torres v. United States, 270 F.2d 252, 253–255 (9 Cir. 1959), cert. denied, 362 U.S. 921, 80 S.Ct. 675, 4 L.Ed.2d 741 (1960); Spevak v. United States, 158 F.2d 594, 596–597 (4 Cir. 1946), cert. denied, 330 U.S. 821, 67 S.Ct. 771, 91 L.Ed. 1272 (1947); United States v. Arellanes, 238 F.Supp. 546, 549–550 (N.D.Cal. 1964); cf. Brooks v. United States, 330 F.2d 757, 758 (10 Cir. 1964), cert. denied, 379 U.S. 852, 85 S.Ct. 100, 13 L.Ed.2d 56 (1964).[149]

(B) *Sequence Of Events Leading To Denial Of Further Continuance*

In the instant case, the sequence of events in the light of which the Court was required to exercise its discretion whether to grant a further continuance or to proceed with the trial September 13, as ordered September 8, may be briefly summarized.[150]

Defendant was indicted May 20. He was arraigned and released on bail June 14, at which time his retained counsel from out of state, who had represented defendant for more than a year, was granted permission to appear for defendant for all purposes in the case.

August 4 the case was assigned for trial September 8, the first day of the fall term, pursuant to the request of the government acting under the expediting clause of 50 U.S.C.App. § 462(a) (last sentence).

September 7 defendant's motion to dismiss the indictment was fully argued, defendant's retained counsel collaborating closely with defendant with whom he appeared to be completely compatible. After the Court announced it would reserve decision on the motion to dismiss, defendant's counsel, with defendant present, asked the Court when the trial would begin by selecting a jury, to which the Court replied, "Tomorrow." Defendant's counsel, with defendant present, said, "All right, your Honor." Later that day the motion to dismiss was denied and counsel were promptly notified.

The following morning, September 8 (the day upon which the case had been assigned for trial a month before), at

149. As in any area of exercise of a trial court's discretion, of course there are cases to the contrary. See, e.g. Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); United States v. Johnston, 318 F.2d 288 (6 Cir. 1963); Tinkle v. United States, 254 F.2d 23 (8 Cir. 1958).

Amicus curiae counsel, in arguing on defendant's behalf in support of his post-conviction motion for a judgment of acquittal or a new trial, urged the Johnston case vigorously upon the Court. Aside from the fact it is not controlling upon this Court, it is distinguishable in that there defendant's counsel himself withdrew (whereas defendant in the instant case dismissed his counsel); there the case was complex, involving multiple counts against multiple defendants, charging mail fraud, wire fraud and conspiracy (whereas the instant case involved a very simple charge in one count against one defendant); there no continuance was granted (whereas here there was); there, unlike the instant case, no mandate of Congress was involved giving the case precedence and directing that it be advanced for immediate hearing; and there, unlike the instant case, there was no conduct on the part of defendant making a continuance to retain substitute counsel a futile act on the part of the Court.

150. Findings of Fact, supra pp. 883–889.

the request of defendant's retained counsel and because of his illness, the Court granted the continuance of the trial requested by defendant's counsel, namely, to September 13, upon the condition that either defendant's present counsel or substitute counsel would be prepared to go forward with the trial on September 13. Defendant, aware that his motion to dismiss had been denied and upon being informed of the continuance granted by the Court, announced he was "in the midst of dismissing counsel" (a fact unknown to his counsel) and requested additional time within which to retain new counsel, urging that his defense was not simple because it involved "many things —Nuremberg trials, international law, conventions on war crimes and torture and genocide, et cetera" and that "it would take a lot of time for a lawyer to acquaint himself with all of these points of my case." The Court, after explaining to defendant his right to counsel, made it clear, if he intended to retain substitute counsel, that would have to be done in sufficient time to enable substitute counsel to be ready to proceed with the trial September 13. The Court reaffirmed its order that the trial would begin September 13, stating that "Under all of the circumstances, in view of the nature of the case, the issues involved, the law involved and the time that this case has been pending in this court, and the time that your matter has been pending before the draft board, this Court believes that it is not only a fair order which the Court is making but it is the only order that the Court can make in good conscience."

A written order was entered September 9 continuing the trial to September 13, "at which time defendant and his present or substituted counsel are ordered to be present and ready to proceed with the trial of the case."

September 13, with the instant case next on the calendar for trial, defendant appeared with his retained counsel who asked to be relieved as counsel because of "incompatibility on the way this matter should be presented" and "where he is unable to pay me a fee—although he did indicate to the Court that he might be able to pay someone else." The only other attorney with whom defendant consulted during the five day continuance (so far as defendant disclosed to the Court) was attorney Gruber whom he had telephoned late the night before— five days after he had been warned by the Court that if he intended to retain substitute counsel he must act promptly; and the upshot of his conversations with attorney Gruber was that defendant did not request Gruber to represent him.

Upon the advice of defendant's retained counsel "to let this young man proceed as attorney for himself" because "[t]his is a very intelligent young man and he knows precisely what he wants to do" and upon defendant's own representation that "I would prefer to defend myself * * * I would prefer to proceed right now alone" and upon defendant's categorical statement that he wished to waive his right to counsel, the Court accepted the waiver as intelligently and competently made. Attorney Apicella, who assured the Court he was prepared to try the case on Monday [September 13] and whose outstanding qualifications were known to the Court, was appointed to render such assistance as defendant wished to avail himself of. Defendant's retained counsel was ordered to remain through the impanelling of the jury September 13 to provide continuity of counsel and to be available to defendant and attorney Apicella for consultation. After a recess for this purpose, the jury was impanelled, after which the trial was recessed until the following morning to enable defendant to confer with his counsel and with any other counsel whom he might wish to bring into the case. Thereafter the trial proceeded to a conclusion as set forth above.[151]

151. Findings of Fact, supra at pp. 889–893.

**(C)** *Basis Upon Which Court Exercised Its Discretion In Denying Further Continuance*

The considerations upon the basis of which the Court exercised its discretion not to grant a further continuance and to proceed with the trial on September 13, may be briefly summarized:

(1) Congress provided in mandatory language, in the section of the statute under which this prosecution was brought, that trial of such cases shall be given precedence and shall be advanced for immediate hearing, 50 U.S.C.App. § 462(a) (last sentence), and the government properly invoked this expediting provision.

(2) The issues upon which defendant was to be tried were simple: whether defendant wilfully failed to report for induction pursuant to a valid induction order issued by his Local Board which he had received.

(3) Defendant's insistence upon defending the case on the issues rejected by the Court in denying his motion to dismiss the indictment convinced the Court of the futility of granting any further continuance. His insistence upon defending on these issues after the Court ruled against him by denying his motion to dismiss was the reason for the "incompatibility" leading to his dismissal of retained counsel immediately after the Court denied his motion. It was the reason for his inability to retain substitute counsel during the continuance granted. It was the only reason he ever advanced, and the only reason advanced by any one on his behalf as disclosed by the record, for requesting a further continuance—to obtain counsel who "would take a lot of time * * * to acquaint himself with all of these points of my case", referring to "many things—Nuremberg trials, in-ternational law, conventions on war crimes and torture and genocide, et cetera". It was perfectly clear to the Court that no responsible counsel would submit to the conditions imposed by defendant for acceptance of a retainer to defend him. Granting an indefinite continuance at defendant's request (he never asked for a specific period of time) under these circumstances would have been futile and not a sound exercise of discretion.[152]

(4) Defendant led the Court to believe that he wished to, and in fact did, waive his right to counsel—not only by his words of waiver, but more importantly by his entire conduct, including his dismissal of retained counsel on the day the case had been assigned to proceed to trial; his refusal to obtain substitute counsel during the continuance following his dismissal of his retained counsel; his refusal to accept the services of either his retained counsel or his court-appointed counsel, both of whom were present with him at the counsel table on the day the trial began; and his insistence upon defending the case upon the issues rejected on his motion to dismiss the indictment, thus effectively precluding voluntary representation by any lawyer worthy of his profession.

(5) Further delay in commencing the trial of the case would have made it increasingly difficult, if not impossible, to impanel an impartial jury. The publicity tactics of defendant and his cohorts, immediately upon arrival in New Haven each day there was a hearing in his case, included distributing press releases to the local newspapers and radio stations; holding press conferences in the corridors of the courthouse; making street-corner speeches at busy intersections near the courthouse; and organizing picket lines in front of the court-

---

152. "The constitutional right to be represented by counsel does not, of course, guarantee an attorney with whose advice the defendant can agree. To discharge an attorney because of disagreement, after trial has commenced and where, under the circumstances, the only alter-natives are to proceed without counsel or with wholly unprepared counsel, can amount to a waiver of the right to be represented by counsel." Arellanes v. United States, 326 F.2d 560, 561 (9 Cir. 1964).

house, through which all jurors had to pass in entering or leaving the court-house. The result was substantial defendant-generated publicity in the local and state press, and to some extent beyond. The publicity was uniformly unfavorable to defendant and his "cause". Seventy veniremen from which to impanel a jury were present on September 8, when the case was continued to September 13. They were present again on September 13. Any further continuance, particularly in the light of the adverse publicity resulting from defendant's attempt to convey his "political message" [153] would seriously have jeopardized his chances, in the opinion of the Court, of being tried by an impartial jury.[154]

(6) Finally, from the standpoint of sound judicial administration, the Court was deeply concerned, not only that the lawful rights of both defendant and government in the case at bar be fully protected, but likewise that the public interest be safeguarded. For after all, defendant had undertaken, in not the most restrained language, to inflame public opinion against a vital instrument of national policy—the draft law. The fact that he had been conspicuously unsuccessful and had succeeded, if at all, in merely galvanizing public opinion against him and in support of the very instrument he sought to defy, did not make it a whit less important to exercise that constant vigilance "required to maintain the delicately calibrated balance between the rights of the individual suspected or accused of crime and the rights of society to be protected from criminal interference with its liberty and property." United States v. Thompson (2 Cir. 1965). Here was a potentially explosive situation. It was becoming more so with each day of delay in proceeding with the trial.[155] The Court can judicially notice, and did, that the draft quotas shortly before September 13 had been doubled. Millions of young men of draft age at that very time were registering at colleges and universities throughout the land, including several thousands at a notable institution of higher learning across the Green from our courthouse. Defendant's pickets in front of the courthouse were something less than peaceful; at least one was arrested, charged with assaulting a police officer and convicted. The Court received information from sources of the highest reliability that upon each successive day of a court hearing in the instant case the crowds jamming the courtroom, the courthouse corridors and the courthouse exits and entrances were being infiltrated in increasing numbers with known hard core subversives. Any further delay in proceeding with the trial of the case, particularly in view of the futility for defendant's purpose of granting him any further continuance, would have been not only an abuse of discretion; it would have been a plain abdication of judicial responsibility.

## CONCLUSION

It is important to bear in mind what this case does not involve. It does not involve conscientious objection to war under the law; defendant flatly disclaimed he was a conscientious objector. It does not involve freedom of speech; no matter how misguided, ill-advised or sickening his tommyrot utterances may be to the great majority of Americans, defendant was not indicted, tried, convicted or sentenced for anything he said or wrote or distributed. He stands convicted by a jury of his peers of the felony of willful refusal to report for induction in the armed forces of the United States. That is what is involved. And, viewed in the light most favorable to defendant, while he may regard himself as a martyr it must be remembered, as Justice Cardozo observed some years ago, that "One who is a martyr to a principle—which may turn out in the end to be a delusion or an error—does not prove

---

153. Supra note 140.
154. Tr. 52, 9/27/65 [R. 444].

155. Tr. 53–54, 9/27/65 [R. 445–446].

by his martyrdom that he has kept within the law." [156]

■ Under our law a defendant charged with crime is entitled to his day in Court. He is privileged to utilize that day in Court, if he chooses, to press upon the Court spurious issues as this defendant did on his motion to dismiss the indictment. But once such issues have been ruled upon and rejected, he is not privileged, nor does he have the right, to obstruct the administration of justice by dismissing on the day of trial counsel who refuses to continue to press those issues upon the Court and jury, by claiming inability to retain substitute counsel because of his insistence upon injecting such issues and by refusing the services of competent court-appointed counsel—all to the end of claiming a denial of his constitutional right of counsel. Nor, finally, does he have a right to a second day in Court, under such circumstances, when his avowed plan is "to use my trial as a forum in which to try the United States Government before the world * * * and utilize every other means available to stir up a storm * ·* * to make sure that [the Government] ends up with burnt fingers and a kick in the behind." [157]

The constitutional right of Assistance of Counsel is too precious for such degenerate subversion.

The Court's denial of defendant's post-conviction motion for a judgment of acquittal or a new trial is confirmed.

---

The Court expresses its appreciation to Anthony G. Apicella, Esq., court-appointed counsel for defendant, for extraordinarily competent services rendered under the most difficult circumstances, and likewise its appreciation to William K. Muir, Jr., Esq., *amicus curiae*, for his articulate and perceptive brief and oral argument in support of the right to counsel point raised in defendant's post-conviction motion for a judgment of acquittal or a new trial.

## APPENDIX
### REMARKS OF DISTRICT COURT AT TIME OF SENTENCING MITCHELL ON SEPTEMBER 15, 1965 *

THE COURT: I will ask the defendant please to stand and remain standing until sentence is imposed.

The Court does regard the offense of which Mr. Mitchell stands convicted by a jury as a serious offense. The Act of Congress which defines the offense and prescribes the penalties speaks for itself as to the severity of the offense. There is not the slightest question in the Court's mind as to the guilt of the defendant. It is established, indeed, by documents of which there can be no question, documents in the Draft Board file, some of which are documents originating with the defendant himself. The issues are clearcut, simple and in my opinion have been correctly determined by the jury.

Regardless of the views Mr. Mitchell may have, regardless of his philosophy, the Court expresses no view on those matters. That is not what he has been tried for. He has been tried and convicted of the very simple charge of wilfully and knowingly failing to report for induction in the Armed Forces of the United States pursuant to a valid order of the Draft Board, due notice of which was given to him. It is just as simple as that.

The Court nevertheless is mindful— in the matter of imposing punishment— the Court is mindful of a number of considerations: First, the demeanor and conduct of the defendant himself in so far as it reflects upon his ability to rehabilitate himself; for, after all, one of the functions of intelligently imposed

---

156. Hamilton v. Regents of University of Cal., 293 U.S. 245, 268, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934) (concurring opinion).

157. Govt. Ex. 2, Document No. 19, pp. 3-5; supra pp. 881-882.

* Tr. 14-24, 9/15/65 [R. 382-392].

punishment is to afford an opportunity to the defendant to rehabilitate himself. Secondly, and of substantial importance in this case, is the factor of deterrence. As the function of the sentence here, it is intended to deter others who may have any notions or ideas that they can avoid service in the Armed Forces of this country by any such conduct as Mr. Mitchell has here demonstrated.

Fortunately, the views that Mr. Mitchell espouses, aside from being wholly irrelevant and having nothing whatsoever to do with this case—and certainly not entering into the determination of the sentence in any way, shape or form—fortunately those views appear not to have cut any ice whatsoever in this country or in this community. The so-called "cause" which Mr. Mitchell espouses apparently has fallen on deaf ears. If it has had any effect at all it appears to have galvanized determination on the part of upright loyal citizens of this country to rally to the support of their government in a time of need.

The Court cannot avoid wondering what would be the fate of Mr. Mitchell and ones of his ilk if he were to attempt to conduct the sort of disaffiliation with recognized authorities of this country—if he were to attempt that behind the Iron Curtain or behind the Bamboo Curtain. It is perfectly obvious that what has been attempted here is to avail himself of the sanctuary provided by the democratic government under which we live and the broad right of free speech accorded. Whether that right has been abused or not is not for me to say, and has not been the subject of this trial nor an issue determined by the jury.

In any event, the sentence the Court intends to impose and will impose forthwith, as I said before, is intended, to the extent that the Court in good conscience can do so, to afford the defendant an opportunity to rehabilitate himself and to demonstrate, if he is so minded, that he is willing to rehabilitate himself. And furthermore, the sentence is intended as a sharp warning to any who may

have any notion that they can avoid military service in this country by the sort of conduct that Mr. Mitchell has resorted to.

It is the sentence of the Court, pursuant to Title 50 of the United States Code, Appendix, section 462(a), that you, David Henry Mitchell, III, be committed to the custody of the Attorney General of the United States or his designated representative, pursuant to Title 18 of the United States Code, section 4208(a) (1), for a term of imprisonment of not less than 18 months and not more than 5 years. The Court in fixing the minimum and maximum limits of the period during which Mr. Mitchell is committed to a Federal penitentiary, intends that, as provided by this statute, 18 U.S.C. section 4208(a) (1), intends that the Federal Board of Parole shall in its discretion entertain an application by Mr. Mitchell for parole after he has served a year and a half, that is, 18 months in Federal penitentiary. It is the strong recommendation of this Court, and I underscore "strong recommendation" in a most emphatic way, that no parole be considered by the Federal Parole Board at any time unless and until Mr. Mitchell unequivocally assures the Parole Board of his intention to report for induction into the Armed Forces of the United States. In other words, while the ultimate discretion is with the Parole Board as a matter of law, for whatever the recommendation of this Court may be worth, it is the intention of this Court that the full maximum penitentiary term provided by statute, that is, five years, be served unless the defendant, after serving for 18 months, makes clear his intention to report for induction.

In addition to the penitentiary sentence which I have just imposed, the Court orders that you pay a committed fine in amount of five thousand dollars. It is ordered that that fine be paid forthwith. And of course, being a committed fine, you may not be released until it is paid.

Finally, the Court recommends that Mr. Mitchell be imprisoned in the United

States Penitentiary at Leavenworth. The Court wishes to make very clear that in so far as the recommendation of this Court is concerned Mr. Mitchell should not be imprisoned in the state of Connecticut or anywhere in the vicinity of the state of Connecticut. And the Court will assume, absent notification to the contrary by the Federal Bureau of Prisons, that Mr. Mitchell will be imprisoned at Leavenworth and not in the area of Connecticut.

With respect to bond pending appeal, first the Court will direct Mr. Apicella, as Court-appointed counsel for the defendant, and in accordance with the well established practice in this court in such situations—the Court directs Mr. Apicella to file a notice of appeal on behalf of the defendant, and will ask that that be done tomorrow—thus protecting his rights on appeal—or thus assuring his right to take an appeal.

The Court will request the Clerk to accept that notice of appeal, when it is prepared and submitted by Mr. Apicella on behalf of Mr. Mitchell, without the filing fee on behalf of Mr. Mitchell, without the filing fee in the first instance. Mr. Mitchell will be given ten days within which to pay the filing fee, which I believe is five dollars, is it not, Mr. Grimes?

DEPUTY CLERK GRIMES: Yes, your Honor.

THE COURT: With respect to bond pending appeal, does the Government have any recommendation as to amount?

MR. OWENS: The Government would recommend a bond in the amount of $5,000 with surety, your Honor.

THE COURT: Does the defendant wish to be heard on that matter, either through Mr. Apicella or directly?

MR. APICELLA: As I have previously stated, your Honor, I won't comment on the Government's recommendation of bond unless the defendant confers with me prior to that.

DEFENDANT MITCHELL: On the matter of bond I would request that there be no bond since I have been openly challenging the Government on these issues for four years and I still hope to openly challenge the Government, either in a new trial or some trial I can get as a result of appeal to a higher court—where I can prepare a defense, do have a right to counsel, and can present all the issues I have been challenging them with.

I am not running anywhere. I am chasing the Government, and I don't think there is any necessity for bond at all.

THE COURT: The bond which has been fixed heretofore in this case—I believe it was fixed by the United States Commissioner—was a surety bond in amount of $1,000. That of course was an appearance bond for purposes of appearance in this court pending proceedings in this court.

The Court orders that a surety bond in amount of $5,000 be posted by the defendant as bail pending appeal. Upon the posting of that bond and upon its approval by the Court as to form and substance, the defendant may be released —or may be enlarged on such bail pending appeal—upon the condition that his appeal his prosecuted diligently and strictly in accordance with the rules of this court and with the rules of the Court of Appeals for the Second Circuit. A formal order so specifying the appellant's obligations in that respect will be entered.

MR. OWENS: Your Honor, may I be heard just a second?

I believe at the time Mr. Mitchell was originally presented to the Court there was a question raised as to where the bond should be made returnable and where he is allowed to go during that time. I think originally it was before your Honor and you said it was made returnable—where he had the right to travel between the Southern District of New York, the Eastern District of New York and the District of Connecticut.

THE COURT: The Court will order that the same conditions be incorporated

in the bail bond pending appeal as in the appearance bond in this court, namely the condition of the bond is that defendant shall not depart the District of Connecticut or the Eastern District of New York or the Southern District of New York. He is permitted to travel within those three districts.

That concludes proceedings. The defendant is remanded to the custody of the Marshal until the posting of the bond which has been ordered.

MR. OWENS: Your Honor, Mr. Heyman has another matter to bring before the Court, also.

MR. APICELLA: Your Honor, I also have a matter that I would like to take up.

After the filing of the notice of appeal, your Honor, what is my status at that time?

THE COURT: The Court will order that Mr. Apicella be discharged with respect to any further obligations in this case after he has filed the notice of appeal which the Court has ordered—unless Mr. Mitchell wishes to confer with him and avail himself of Mr. Apicella's advice in connection with the filing of any motions to set aside the verdict or for a new trial or any other motions that he may be advised to file.

I told you at the outset, Mr. Mitchell, that your rights in that respect would be preserved. You do have under the rules five days within which to file any motion or motions of the sort that I have mentioned—motion for a new trial or a motion to set aside the verdict or combination of those motions.

If you wish Mr. Apicella to assist you in preparation of such motions, he will be glad to do so and I will order him to do so.

Do you wish the benefit of his advice?

DEFENDANT MITCHELL: No.

THE COURT: Do I understand, Mr. Mitchell, that you are declining any further assistance from Mr. Apicella—that you intend either to retain counsel of your own choice for the purpose of filing those motions, or that you intend to continue to act pro se in your own behalf in filing the motions?

DEFENDANT MITCHELL: Your rightness—the first sentence you said was right. I do not want the services of Mr. Apicella, as I have not wanted them all along; and I am not taking them.

THE COURT: Well, I wish to make it clear so there will be no question about it, that you have five days from today, that is until Monday, September 20, to file any motions that you may care to file. And that is provided for in Rule 29(b), Rule 33 of the Federal Rules of Criminal Procedure. And the Court stands ready to provide you with assistance, that is, effective assistance of counsel, at any time you wish such assistance in connection with the preparation, filing and argument of those motions.

Is there any other matter to be taken up? (Pause.) If not, the Mitchell case is concluded.

DEPUTY CLERK GRIMES: May we issue a temporary mittimus, your Honor?

THE COURT: Yes.

(Hearing closed on Wednesday, September 15, 1965, at 5:05 P.M.)